Noel SMITH (Plaintiff), Appellant and Respondent,

v.

Stuart TRACY and Isis Tracy, his wife, Charles Tracy and Viola Tracy, his wife, d/b/a Tracy Brothers (Defendants), Respondents and Appellants.

No. 49457.

Supreme Court of Missouri,

Division No. 1.

Nov. 11, 1963.

Motion for Rehearing or to Transfer to Court En Banc Denied Dec. 9, 1963.

Rendlen & Rendlen, Hannibal, J. Patrick Wheeler, Canton, for appellants Tracys.

Tom B. Brown, Edina, and J. Andy Zenge, Jr., Canton, for respondent Smith.

HOLMAN, Judge.

The various controversies that have arisen between plaintiff and defendants, as hereinafter detailed, resulted from a contract whereby defendants agreed to purchase plaintiff's 732-acre farm located in Lewis County, Missouri. In this ejectment action plaintiff, alleging that defendants had breached the contract in a number of respects, sought possession of said land. Defendants filed an answer and a counterclaim consisting of five counts. In the first count defendants sought to recover $100,000 actual and $200,000 punitive damages because of the alleged false representations of plaintiff which induced defendants to

agree to purchase said farm. Count II sought damages resulting from plaintiff's false representations which induced defendants to agree, in March 1957, to purchase from plaintiff, a grain elevator located in Quincy, Illinois. In the third count, defendants sought a decree reforming the various contracts in order to conform to an oral agreement of modification alleged to have been entered into subsequent to the execution of said contracts. Count IV was based upon the theory of rescission and sought recovery of various sums of money as a result thereof. The fifth count sought to restrain plaintiff from selling a 188-acre farm defendants had contracted to buy from plaintiff's mother on February 10, 1958.

This case was tried before the court and testimony was taken from time to time on approximately 25 different days over the period of a year, commencing March 15, 1961. The transcript and supplemental transcript contain 2,500 pages of testimony and there are several hundred exhibits. Much of the testimony, however, related to issues which are not involved on this appeal, and in our statement of facts we will endeavor to recite only the evidence pertinent to the issues now presented to us.

During the year the case was being tried defendants retained possession of the farm and because of that fact, in the fall of 1961, plaintiff sought and obtained an injunction relating to the disposition of the crops and later obtained the appointment of a receiver to harvest the crops and retain possession thereof pending the outcome of the case.

At the conclusion of the trial the court filed a memorandum wherein it was found that defendants had defaulted in various payments due under the contract of sale and that by reason thereof, plaintiff was entitled to possession of the premises, together with a judgment for the reasonable rental value of the premises at the rate of $1,000 per month from January 15, 1961, the date plaintiff had demanded possession. The court found for defendants on Count I of their counterclaim and indicated that

they were entitled to recover actual damages in the sum of $56,828.18 and punitive damages in the amount of $25,000, making a total judgment of $81,828.18.

The trial court found for plaintiff on Counts II, III, and IV of defendants' counterclaim. The court also found for plaintiff (to whom the land had been conveyed by his mother) on issues relating to default in payments on the contract relating to the 188-acre farm involved in Count V, but provided that there would be no forfeiture if defendants would pay the amounts in default on or before March 15, 1962.

On March 31, 1962, the court entered final judgment in accordance with the findings heretofore mentioned. The court also entered an additional judgment approving (1) the accounting of the receiver and allowing the receiver compensation in the amount of $2,200, and his attorney compensation in the sum of $1,200, and providing that defendants were entitled to all assets remaining in the hands of the receiver; (2) that the costs of receivership be borne one half by plaintiff and one half by defendants; and (3) that plaintiff was entitled to receive certain A.S.C. government payments on the 1962 crop program, and that defendants were entitled to the 1961 corn crop and the 1961 A.S.C. payments. Court costs of the case were assessed one half against plaintiff and the remaining one half against defendants. Plaintiff and defendants have each appealed from that judgment.

Plaintiff, upon this appeal, contends that defendants were not entitled to any judgment on Count I of their counterclaim. Defendants here contend that they were entitled to a much larger judgment on Count I of their counterclaim, and that the court erred in assessing any of the costs of the receivership against them. Although the evidence first adduced related to proof of the allegations in plaintiff's petition, we have decided to state first the evidence offered by defendants as such will present a better background for an understanding of the events which culminated in the execution of the various contracts and the matters involved in the alleged breach thereof.

Stuart Tracy testified that in 1955 he lived near Beardstown, Illinois, and that he and his brother Charles operated a 524-acre farm which they owned and another 556-acre farm which they had rented for a number of years; that they had engaged in grain farming and in the raising of purebred Duroc hogs and purebred Angus cattle; that in December 1955 he was contacted by J. M. Britton, a real estate agent who was associated with C. F. Bell in endeavoring to sell plaintiff's farm; that on December 27, Mr. Britton accompanied him, his brother Charles, his father, and his son Rex, on a trip to look at the farm. Upon arrival there they met plaintiff who took them on a tour of the farm in his automobile. In addition to the ordinary farming operations, they learned that plaintiff had been conducting a garbage feeding operation on this farm. Stuart further testified that plaintiff told them that during the past three years the farm had been rented to Mr. Uhland and Mr. Henry who operated the farm and the garbage feeding operation, plaintiff receiving 50% of the net profit and each of the tenants receiving 25% thereof; that they learned from plaintiff that he had an exclusive contract with the City of Quincy to receive the garbage collected in that city, and that this garbage was cooked in accordance with the requirements of Missouri law and fed to the hogs; that plaintiff told them the garbage feeding operation was very profitable and that he would assign his garbage contract to anyone who purchased the farm; that plaintiff told them he would sell the farm for $208,620, with $25,000 paid down and the balance to be paid in ten years, together with interest at 5%. He stated that on January 2, 1956, he and Charles returned to the farm, accompanied by their wives and his son Rex, and that on that occasion plaintiff took them on another tour of the farm, after which they returned to the main farm house where they conferred at some length with plaintiff.

Stuart testified further that at that conference plaintiff explained to them how the garbage was processed, and advised them that the boiler plant, tractor, loader, and other equipment used in connection with that operation would be sold with the farm; that plaintiff explained that the plant was not in operation at that time because his two tenants had quit operating the same and were leaving the farm and he had no labor to operate the plant; that they asked plaintiff about the profits of the garbage feeding operation during the years 1953, 1954, and 1955, and he told them that his share of receipts from that operation averaged a gross of $34,000 annually and a net profit of $21,000 a year; that the hogs would each gain 1¾ pounds per day and that each hog would not eat more than two pounds of corn per day in addition to the garbage. Stuart further stated that plaintiff told them that they had fed an average of 3,000 head of hogs per year, that garbage was a perfect food for hogs, and that his hog losses were very negligible; that he would lose a hog every ten days or two weeks, usually caused by a toothpick in the garbage; that there was no problem concerning disease; that plaintiff also represented that the pond which furnished water for the hog feeding operation was 20 feet deep and contained an adequate supply of water for that operation; that plaintiff also stated that there was ample commercial grain storage space which could be obtained locally at a rental of 1¢ per bushel per month; that at that meeting plaintiff brought out a pile of papers which he said were his records of the farm operation during the past three years, but that they could not "make heads or tails" of these records, and asked him to state the facts to them; that as he did so they made notes as to what he said.

Stuart further testified that on the following day he returned to the farm with Mr. A. C. Hart, president of a bank in Arenzville, Illinois, and a Mr. Lewis, a field representative of National Stock Yards National Bank, National Stock Yards, Illinois; that plaintiff at that time took them on a tour of the farm and at the conclusion thereof this group went into the house and talked about the farm. At that time plaintiff told them that the farm land had already been leased for the year 1956, but that if they bought the farm they would have possession of the main farm home and a tract of about 30 acres used in connection with the garbage feeding operation, and another 60 acres of pasture land; that on this occasion plaintiff again explained the garbage feeding operation and stated the profit he had made thereon during the past three years and repeated the other representations heretofore stated concerning that operation.

Stuart stated that during the next few days defendants considered the information plaintiff had given them and he subsequently called plaintiff and made an appointment to meet him at the farm on January 9; that on this occasion he told plaintiff that they were satisfied with plaintiff's representations concerning the farm and had figured out an operating budget and had concluded that the farm would be a paying proposition; that they then drove to Canton and went to the office of J. Andy Zenge, Jr., an attorney, where a contract was prepared.

The contract, signed on January 9, 1956, provided generally that plaintiff would sell the land in question to defendants for the sum of $208,620, payable as follows: $2,500 cash, and a note for $2,500 payable February 1, 1956; $20,000 to be paid on February 1, 1956; and $12,862 to be paid each year for ten years, together with 5% interest, at which time the balance of $55,000 would be due and payable; defendants would receive the landowner's share of the crops raised in 1956, and the payment due January 1, 1957, should not exceed the value of such crops. This contract contained a provision that another contract would be entered into not later than March 1, 1956, for the purpose of setting out in detail the agreement generally contained therein.

Stuart further testified that after entering into the aforementioned contract he and Charles cancelled the lease on their

rented farm and, on January 26 and 27, 1956, held a sale at which they disposed of their purebred Angus cattle and Duroc hogs and certain farm equipment; that on February 1, 1956, he and Charles, their wives, and their attorney, A. D. Van Meter, returned to Mr. Zenge's office in Canton for the purpose of entering into a final contract; that at that time they learned for the first time that the garbage contract was not assignable, but plaintiff represented that he would agree to hold the contract for the benefit of defendants. They also learned that plaintiff was insisting upon making certain other changes in the contract, principally (1) that the interest would be "built in" to the purchase price which would increase the amount thereof to $271,492; (2) he desired a lien on the crops for the purchase price, which would preclude defendants from mortgaging their crops in order to obtain operating capital, and (3) a provision which would permit plaintiff to place a mortgage on the land, the arrangements for which had already been negotiated by him. Defendants, upon the advice of their attorney, told plaintiff they would not purchase the farm under those conditions and requested the return of the money they had paid. Plaintiff refused to return the money and told them, "You will get that money only through a lawsuit." Stuart further stated that because they had surrendered the lease on the farm in Illinois, and had sold out their livestock and had made other irrevocable commitments, they went ahead and endeavored to agree with plaintiff on a contract; that the provision for "built in" interest was unsatisfactory because it would prohibit them from deducting the item of interest on their income tax returns; that in order to compensate for that item, they entered into a separate contract with plaintiff wherein it was agreed that a depreciation schedule would be prepared showing values on farm buildings, etc. in accordance with the increased purchase price, and that in the event the Internal Revenue Service should refuse to accept said values for depreciation purposes, the contract would be changed by eliminating the amount of interest added to the purchase price, and to provide for interest upon the unpaid purchase price to be computed at the rate of 5% per annum; that the sales contract was signed by plaintiff and defendants that day, and defendants paid, at that time, $22,500 upon the purchase price.

It is unnecessary to give the details of the aforementioned contract, but it may be said generally that it provided for annual payments of $19,149.24 due on the first day of January each year for ten years, the balance of $55,000 to be paid at the end of that period. It contained a provision, heretofore mentioned, to the effect that defendants could not encumber the crops, and upon the default in any payment, or the failure of defendants to perform all covenants and agreements therein contained, plaintiff had the option of declaring the contract void and would be entitled to immediate possession. It also contained the following provisions: "It is understood and agreed that this land is being sold to second parties in its present condition and second parties stipulate that they have examined the premises and are fully aware of the conditions thereof. * * * First party has a contract with the City of Quincy, Illinois, by which the said City of Quincy hauls garbage to the above described premises for feeding to hogs. This contract has a provision against assignment. First party agrees to hold said contract for the benefit of second parties until same can be placed in the name of second parties or until consent can be obtained for assignment to second parties. First party further agrees to use his efforts to obtain assignment of said contract to second parties . * * *."

On February 8, 1956, Charles moved onto the newly purchased farm and started the hog feeding operation in a small way. Stuart remained on the Illinois farm until it was sold later that year but frequently visited and worked upon the Missouri farm and finally moved to that farm during the latter part of 1956. Plaintiff rented a room

from Charles in the main dwelling house and stayed there when he was in that area, until June 1957, so that defendants frequently saw and talked with plaintiff during that period. Stuart testified that shortly after they began the hog feeding operation they discovered that water in the pond was low and that the pond was only about 8 feet deep instead of 20 feet as represented by plaintiff; that they immediately arranged for the proper equipment and had the pond enlarged at a cost of $300, but that nevertheless, in June 1956, the water supply in the pond was completely exhausted; that they attempted to haul water but found that to be impractical so they rented pipe and a pump and pumped water from another pond approximately one half mile away and in that manner pumped sufficient water into the pond, at a cost of $700, to enable them to continue the hog feeding operation; that prior thereto they had spent $200 in hauling water.

Stuart further testified that after they began the hog feeding operation they discovered that the garbage was of very poor quality and contained many items of an inedible nature, such as cutlery, glass, clothing, ashes, dead dogs and cats, and other trash; that their hog losses were heavy and in 1956 they lost 174 head of the value of $5,006.49; that they spoke to plaintiff about these losses and he said he had had the same experience and that the situation would correct itself and if it did not he would do anything he possibly could to help them get along with the operation; that in the fall of 1956, defendants discovered that there was no grain storage available in elevators in the vicinity, and, that such elevators had never rented storage space; that when they complained to plaintiff about the situation he told them he had an elevator in Quincy which he would sell for $15,000; that defendants inspected the elevator and found it needed numerous repairs, which plaintiff agreed to make, and they entered into a verbal agreement for the purchase of same; that defendants then placed some 20,000 to 30,000 bushels of corn in the elevator; that on March 26, 1957, they met in Mr. Zenge's office and contracted for the purchase of the elevator. In closing that transaction the contract of February 1, 1956, was recopied and the provision for the sale of the elevator was incorporated therein. Plaintiffs paid $2,500 on the amount due and the balance was added to the payments due under the original contract. The contract was executed by the parties at that time but was dated February 1, 1956. There was nothing on its face to indicate but that it was the original contract.

Stuart also testified that when they were looking at the farm prior to its purchase plaintiff had represented that there was a 1¼-inch pipe leading from the pond to the hog feeding area and that it had been installed below the frost line; that in January 1957 the water pipe froze and in repairing same they discovered that it was a 1-inch pipe and was not below the frost line. He stated that in August 1956 the federal government filed tax liens against plaintiff, and in July 1957, notices of levy (relating to plaintiff's income tax controversy) were served upon defendants by an agent of the Internal Revenue Service; that plaintiff told him that if they would cooperate with him and keep him posted concerning the "goings and comings" of the revenue agent he would rewrite the contract to cover their death losses on the hogs, after the tax matters were settled. Stuart further stated that on December 31, 1956, they paid plaintiff $15,263.81 which complied with the contract for the payment due January 1, 1957; that they had the money to pay the payment due on January 1, 1958, but at plaintiff's request that payment was deferred until January 1, 1967, because of the tax levy that had been served upon defendants. He stated that during the year 1957 they lost 355 hogs valued at $9,045.91; that they took over full operation of the farm February 1, 1957, and then discovered that the farm had eroded and had uncovered raw garbage and dead hogs that had been buried all over the farm; that this created a situation which was dangerous for hogs from the standpoint

of disease and they fenced these areas in an effort to keep the hogs from coming in contact with the decayed garbage; that on one occasion they found 64 dead hogs that had washed out of a gulley; that during the time they fed garbage in 1958 (six months) they lost 417 hogs of the value of $16,318.58, and they advised plaintiff that they would no longer accept any garbage and that the gates would be closed to the garbage trucks June 18, 1958; that plaintiff then cancelled the contract he had with the City of Quincy.

Stuart testified that shortly after they discontinued the garbage feeding operation he and Charles talked with plaintiff and told him "that the garbage feeding business had fallen on its face, that we weren't going to be able to meet the contract terms because this feeding business had failed, and Smith at that time told us not to worry about it, that he would work out any arrangement that we might desire to extend the terms of the contract, and told us if we would continue to go along with him on the matter of the I.R.S. tax liens that he would do anything we would request. He would rewrite the contract or extend the terms on a basis where it could be worked out." Stuart further testified that at that time plaintiff said the contract payments would be reduced to $7,850 a year and that the contract price would be reduced in order to "compensate for our hog losses, that we would work it out and enter into a new written contract"; that because of the tax levy they could not make payments directly to plaintiff and therefore, in 1958 and 1959, at plaintiff's request, they made certain payments on mortgages and taxes, including $6,950 in 1958 to Bell Investment Company, and $6,800 and $1,225 in 1959 to Bell Investment Company, these being payments on mortgages, and also in 1959, $698.10 and $285.56 for taxes owed by plaintiff on certain of his real estate.

Stuart also testified that in 1956 he employed Mr. Zenge as his attorney to examine an abstract, and in 1957, when he had been injured in an anhydrus ammonia accident, he employed Mr. Zenge to handle that case, and that Mr. Zenge had continued to represent him until after the trial of this case started, at which time he turned the files over to him and suggested he get someone else to handle the matter; that in 1958 he paid Mr. Zenge a retainer fee of $150; that at the time the sales contract was rewritten, in March 1957, he considered that Mr. Zenge was representing both parties.

Charles Tracy testified at length, as did his wife Viola, and Stuart's wife Isis and his son Rex Tracy. (Stuart and Charles' father had died prior to the trial.) The testimony of these witnesses will not be detailed herein. They corroborated the testimony of Stuart Tracy, as heretofore detailed, in substantially all of its aspects. A. C. Hart also corroborated Stuart's testimony as to plaintiff's representation that he made an average net profit of $21,000 per year from the garbage feeding operation, that the water supply was adequate, and that his hog losses were "virtually zero." Charles also testified that it took almost as much corn to make the hogs gain as it would have taken without feeding the garbage.

There was considerable testimony indicating that defendants had spent many thousands of dollars in improvements on the farm during the period they occupied it, but we deem it unnecessary to detail the evidence in regard to those improvements. The evidence also indicated that defendants paid all taxes levied against the farm, although in some instances, particularly for the year 1960, the taxes were not paid until two or three months after they became delinquent. There was evidence adduced which indicated beyond any question that as a result of a contract entered into between plaintiff and the City of Quincy in 1957, plaintiff (unknown to defendants) received $300 per month from the city for disposing of the city's garbage. The amounts paid thereon totaled $4,200 at the time the contract was cancelled.

Three experts testified on behalf of defendants as to the fair market value of this

farm in January 1956. Warren See placed the value at $126,692, J. E. Boudreau appraised it at $117,100, and Clyde Richards fixed the market value at $126,107.50.

Sumner Henry testified that he moved to plaintiff's farm in the fall of 1952 and that he and Everett Uhland were in partnership with plaintiff during the years 1953, 1954, and 1955; that they received from 10 to 15 tons of garbage daily, which was more than they could cook, and that plaintiff told them to haul the excess back into the low places and ditches and use the "dozer" to cover it with dirt, which they did; that their hog losses were from three to five hogs a week during the entire period of their operation; that he received 25% of the profits from the hog feeding operation and during the three years his average net was $4,068.36 per year; that in 1954, when there was a full year's operation, his net had been $7,689.98. This witness admitted that he had had a "falling out" with plaintiff when he left the farm.

Dr. Eugene H. Hinds testified for defendants that he was a veterinarian and in July 1958 examined one of defendant's dead hogs and diagnosed the disease as salmonella. In answer to a hypothetical question this witness testified that the land where the raw garbage and hogs had been buried created a very unhealthy situation and was not fit for a hog raising operation.

Shortly prior to the trial defendants caused to be issued and served upon plaintiff a subpoena duces tecum commanding him to produce all records and papers which he had relating to the operation of the farm during the years 1953, 1954 and 1955. On the first day of the trial plaintiff testified that his records relating to the farm in question had not been separated and were included in the operations of his other farms; that he did not have any records in his possession pertaining to the operation of this farm during the years in question; that he didn't know where those records were; that he had seen some of them from time to time in the possession of various auditors and attorneys who had been working upon his tax problems. Plaintiff further testified that he was not able to estimate his earnings on this farm for the years 1953, 1954 and 1955, and any statement in that regard would be merely a "wild guess." However, on September 28, 1961, after the trial had progressed over a period of several months and defendants had closed their case on their counterclaim, plaintiff produced many records of the nature called for in the aforementioned subpoena and later, in November, produced additional records; but in his testimony thereafter he could not state where these records had been since March 15, nor where he had obtained any of them. Apparently these records purported to cover the receipts and disbursements relating to the garbage feeding operation during the years in question. Upon cross-examination plaintiff was impeached in regard to the accuracy of many of these records. We will not endeavor to say just what is shown by plaintiff's testimony considered in connection with these records. Defendants, in their brief, have made a detailed analysis thereof and assert that, after giving plaintiff the benefit of every doubt, these records show a total profit for the 2½ years of operation of $6,333.94, which would be an average of about $2,500 per year. Plaintiff, in his brief, has not attempted any analysis of these records.

Plaintiff testified that when defendants were in his kitchen on January 2, 1956, he showed them the records of his sales from the hog feeding operation; that he didn't tell them that his average gross receipts from that operation were $34,000 per year but that he did tell them that for the year 1954 he sold $62,000 worth of hogs from that operation, and made the statement that since they would be getting all of the receipts, instead of one half as he had done, they should be able to make a "profitable deal out of the whole business"; that he had experienced no disease among his hogs during the years he operated the garbage feeding enterprise and had not buried large numbers of dead hogs.

In regard to the shortage of water, plaintiff testified that in May or June 1956, he found that a hydrant had been left open and a great deal of water had run out of the pond and he told Charles it ought to be closed off. Plaintiff then categorically denied various statements attributed to him by defendants' witnesses, as follows: (1) that he had had excessive hog losses and that defendants' losses would correct themselves; (2) that he would take care of the defendants about any hog losses they had had; (3) that defendants had ever told him they had suffered heavy hog losses; (4) that he had told defendants that if they would keep him posted about the internal revenue agents he would rewrite the contract for them; (5) that he had told defendants not to show any records to the internal revenue agents; (6) that he had told defendants he would rewrite the contract and reduce the payments to $7,850 a year; (7) that he told the defendants he would give them a deed to the farm and take back a second deed of trust on it; (8) that in Mr. Zenge's office on February 1, 1956, defendants said they wanted to call the deal off and take their money back.

Plaintiff further stated that tax liens had been filed against him by the federal government in 1956 for more than $300,000, and that these liens were released in December 1960.

In rebuttal plaintiff offered Nat Henderson who had worked for him a number of years. He testified that he dug the pond in 1953 which furnished water for the hog feeding operation and that when completed the pond was approximately 20 feet deep; that a 1-inch pipe was installed and it was buried almost three feet; that when Charles Tracy started the hog feeding operation he showed him how to operate the garbage feeding equipment, which equipment was in good operating condition. Upon cross-examination he stated that when plaintiff's hogs were being fed garbage they ate on an average of from 2½ to 3 pounds of corn a day.

Alfred Powell, another employee of plaintiff in the year 1953, testified that the pond was from 18 to 20 feet deep and that a 1-inch pipe had been laid from three to five feet under the ground; that he had never seen the pond with less than 10 feet of water in it. Another witness, Joe Ray, stated that just from looking at it he would estimate that the pond was from 17 to 24 feet deep.

Eugene Logan, an investigator for the U. S. Department of Agriculture, testified that he inspected defendants' garbage feeding operation twice a month for a period of slightly more than one year. He further testified that the water supply for this operation appeared to be adequate; that he thought that hogs would thrive on garbage; that during the first six months of operation Charles had said that his death losses were minor, and that during the year he inspected the operation he thought defendants' losses were less than plaintiff's had been.

C. F. Bell, who had negotiated a mortgage for plaintiff on the farm in question and who, together with Mr. Britton, had sold the farm to defendants, testified that in his opinion the fair market value of the farm on February 1, 1956, was $275 per acre, or $201,300.

George Richter, whose land adjoined the farm in question, testified that plaintiff had watered 300 head of cattle from a spring on the farm. This testimony was adduced because one of the defendants had testified that this spring dried up during dry weather.

J. Andy Zenge, Jr. testified that he had examined the abstract to the 188-acre farm for Stuart but before doing so suggested to Stuart that he have another attorney examine it, but Stuart had refused to do that, saying that he "thought I would tell him if there was anything wrong" with the abstract; that he had suggested to Stuart that he consult Mr. Van Meter before executing the contract in March 1957 which incorporated the elevator into the sales con-

tract, but Stuart had stated that he didn't think that was necessary; that Stuart had paid him a retainer of $150 but at that time he had told Stuart that he represented Mr. Smith and if any difficulty arose between them he would represent Smith and not Stuart.

Charles Tracy, in surrebuttal, testified that plaintiff had never said anything to him about a hydrant being left open and that no hydrant was left open; that he had not told Mr. Logan that his hog losses had not been great.

On the issue of punitive damages defendants examined plaintiff concerning his wealth. We will not detail that evidence. It is sufficient to say that while it is difficult to make an exact finding as to plaintiff's total wealth, it is conceded by plaintiff that the evidence shows that he was possessed of substantial property and we think it may be fairly said that his net worth would amount to at least several hundred thousand dollars.

Upon the issue of false representations, as alleged in Count I of defendants' counterclaim, the court in its memorandum, found as follows: "Prior to the execution of any agreement or contract, plaintiff represented to defendants that (1) the garbage which he had been feeding was a high quality feed and the main feed and the amount of corn needed as a supplement was very minor, when in fact the garbage contained trash and lots of foreign material not edible and a normal amount of corn (and substantially in excess of the 2 pounds per day plaintiff represented) had to be fed in addition to the garbage; (2) the number of hog deaths suffered was 'virtually zero', 'one every 10 days or 2 weeks' when they had been substantially more, 3 to 5 per week; (3) the water supply was adequate and the pond 20 feet deep when in fact the water supply was not adequate and the pond was only 8 to 10 feet deep; (4) his one-half of the annual gross profits was $34,000 (a total gross of $68,-000) and his one-half of the annual net profits was $21,000 (a total net of $42,000), when in fact the average annual net profits were less than half the amount represented, and the net for the one full year of operation was almost $12,000 under the $42,000 represented."

In computing the damages resulting from such false representations the court allowed $1,200 for the costs of enlarging the pond, hauling water, and piping water to the pond. Also allowed was $28,811.58 for defendants' hog losses during the period of the garbage feeding operation. The court further allowed the sum which plaintiff had valued two items of equipment sold to defendants as a part of the garbage feeding operation, being a 1946 truck with garbage cooker bed, $1,750, and a 40 h. p. steam boiler, $8,000.

In regard to the item of lost profits, the court found that plaintiff had represented that the operation had shown a net profit of $42,000 per year on 3,000 head of hogs, or $14 per head. The court found there was no evidence from which defendants' loss of profits could be estimated for the years 1956 and 1958, but that defendants had lost profits in the amount of $11,856.00 during the year 1957, which amount was allowed as a part of the judgment. The court also found that plaintiff had received and wrongfully retained payments from the City of Quincy on the garbage contract in the amount of $4,200, and allowed as a part of the judgment that amount, together with interest in the amount of $1,010.60, or a total of $5,210.60.

■ In a case of this nature we review the record de novo and determine the credibility, weight and value to be accorded the testimony and other evidence, and arrive at our own conclusions based upon the entire record. In so doing we give due deference to the opportunity of the trial judge to see and hear the witnesses and to judge their credibility. Also, we should not set aside the judgment unless it is clearly erroneous. Civil Rule 73.01(d), V.A.M.R.

We will first consider plaintiff's appeal. As stated, he contends, for a number of reasons, that the court erred in entering any judgment for defendants on the first count of their counterclaim. In that connection we should have in mind that " 'the elements of actionable fraud consist of: (1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon.' * * * The establishment of each of these essential elements is necessary to a recovery." Lowther v. Hays, Mo.Sup., 225 S.W. 2d 708, 713.

Plaintiff's first argument in support of the foregoing general contention is that defendants did not rely on his alleged false representations. It is said that they were experienced farmers and hog raisers and that they made and relied upon their own investigation concerning the garbage feeding business. We do not agree with that assertion. There is an abundance of evidence to support a finding that defendants were totally unfamiliar with the practice of feeding garbage to hogs and that they relied upon plaintiff's explanations and representations as to that phase of the farming operation and became convinced thereby that it was a highly profitable enterprise. The cases cited by plaintiff do not apply to the situation before us. In Herzwurm v. Mound City Cab Company, Mo.App., 290 S.W.2d 203, plaintiff, a union member, was assaulted and injured when he returned to work during a strike. He sought to recover from his employer for representing to him that the strike had been settled. The court held that plaintiff had no right to rely on that representation but should have inquired of his own union as to whether or not he should have returned to work. The misrepresentation involved in the case of Hanson v. Acceptance Finance Co., Mo. App., 270 S.W.2d 143, was that the interest included in a note had been computed at 8%. The court held that plaintiffs were not justified in relying on that representation when a simple mathematical computation, with the use of the facts before them, would have disclosed the falsity thereof.

The next contention is that defendants waived any alleged fraud by re-executing the original contract in March 1957, after they had become fully aware of the alleged fraud. Plaintiff has cited the case of Brown v. South Joplin Lead & Zinc Mining Co., 231 Mo. 166, 132 S.W. 693, wherein it was held that where a party entitled to recover for fraud in a contract makes a new contract with the same person, with knowledge at that time of the fraud, he waives his right of action. However, in Brown the court found that plaintiffs, with full possession of the facts, "entered into a new contract in writing with defendant company for a valid consideration, reducing the amount of the royalty, and making other changes in the lease," which new agreement "was to the advantage of the plaintiffs." We do not think the Brown case is applicable to the case at bar. Here there was no change in the terms of the original agreement. The sale of the elevator was merely incorporated therein. Defendants at that time had at least 20,-000 bushels of corn stored in the elevator. They objected to rewriting the original contract and incorporating the elevator sale into it. However, they were told by plaintiff that if they did not wish to consummate the sale in that way they could move their corn. Since they had no place available in which to store their corn they decided to comply with plaintiff's demands. We note also that they were not represented by independent counsel at that time. In that situation we rule that they did not waive their claim for relief by executing that contract.

There is no merit in plaintiff's contention that the court erred in admitting evidence of verbal agreements and conversations which occurred prior to the

time a written contract was executed. It is true that parol evidence of prior negotiations is not ordinarily admissible to vary the terms of a written contract. There is a well-established exception to that rule, however, where fraud in the nature of false representations is alleged. In that instance parol evidence is admissible to support the plea. Burch v. Schmelig, Mo. App., 300 S.W.2d 838. Plaintiff appears to recognize that exception but says parol evidence should not be admitted until there has been a showing of fraud. The fallacy of that argument is apparent. It is almost always necessary to admit parol evidence in order to prove the fraud. A rule making it necessary to show fraud before parol evidence would become admissible, would, for all practical purposes, destroy the exception to the parol evidence rule which exists when fraud is alleged. This point is ruled adversely to plaintiff.

■ The next contention of plaintiff is that the court erred in entering judgment for defendants because defendants were required to elect either to rescind the contract or to perform under the contract and sue for damages and they neither rescinded nor performed. In that connection it should be noted that plaintiff filed no motion to require defendants to elect between any of the remedies sought in their counterclaim. The rule is well established that one injured by fraud may rescind the contract and seek to be placed in status quo, or may stand on the contract and sue for damages. In this case there can be no doubt that defendants, since they retained possession of the land until after judgment, elected to stand on the contract and seek damages. Although they did not comply with all the requirements of the contract, they were at all times endeavoring to do so until after plaintiff filed this suit for possession. Defendants were not required to fully perform the contract in order to bring an action for damages to recover for the fraud. 37 C.J.S. Fraud § 67, p. 358. This point is ruled against plaintiff.

Plaintiff has briefed points contending that certain items of damages should not have been allowed and that defendants should have mitigated the damages by stopping the garbage feeding operation as soon as they discovered it was unprofitable. As will be hereinafter disclosed by our ruling on the issue of damages, it will not be necessary to discuss these points in any detail.

■ The trial judge found the issues concerning plaintiff's false representations in favor of defendants. We not only defer to his findings in that regard, but our own study of all the evidence has caused us to independently arrive at the same conclusion.

■ We will next consider the general subject of damages. Both plaintiff and defendants have raised various points relating thereto. According to the weight of authority generally, the proper measure of damages in a case of this kind is that "the defrauded party is entitled to the difference between the actual value of the property and what its value would have been if it had been as represented." Annotation, 124 A.L.R. 37, 38. This is often referred to as the majority or "Benefit of the Bargain" rule. For extended discussions of that rule, in addition to the annotation, supra, see 24 Am.Jur., Fraud and Deceit, § 227, p. 55, and 37 C.J.S. Fraud § 143 b.(2), p. 477. The courts of Missouri have adopted and constantly adhered to the majority rule. An early case which contains an exhaustive discussion of the rule is Kendrick v. Ryus, 225 Mo. 150, 123 S.W. 937. One of the latest cases in which the rule is discussed is Salmon v. Brookshire, Mo.App., 301 S.W.2d 48. Many other cases following the majority or benefit of the bargain rule may be found in 13A West's Missouri Digest, Fraud, ☞59(2).

One of the principal points briefed by defendants on their appeal is that they should be allowed damages under the benefit of the bargain rule in addition to the

items of actual damages specified in the trial court's memorandum. In that connection we note that there is no expert testimony in the transcript as to the value of this farm, including the garbage feeding operation, if it had been as represented. It has been held, however, that the contract price is strong evidence of the value of the property if it had been as represented. Defendants do not contend that the "as represented" value is any more than the cash contract price, i. e., $208,620, and we will therefore adopt that amount as the value of the property if it had been as it was represented.

■■■■ As stated, defendants contend that they should have been allowed general damages under the benefit of the bargain rule, in addition to the items allowed by the trial court which they say are special damages. We agree that the trial court used the wrong method of computing damages and should have determined the amount of defendants' damages by applying the benefit of the bargain rule, which is well established in this state. We do not agree, however, that defendants were entitled to the items and amounts allowed by the trial court in addition to the general damages. In our opinion, those items cannot be properly classified as special damages except, perhaps, the $4,200 plaintiff collected from the City of Quincy. Moreover, special damages must be specifically alleged. Weller v. Hayes Truck Lines, 355 Mo. 695, 197 S.W.2d 657. No special damages were alleged in the first count of defendants' counterclaim. In regard to the $4,200 item, we note that objection was made to the admission of evidence thereof upon the ground that it did not "tend to prove or disprove any of the issues raised in the pleadings," so that the counterclaim may not be considered as amended in that regard under Civil Rule 55.54, V.A.M.R.

■■■■ As we have indicated, we are of the opinion that the trial court erred in its method of computing actual damages

and that the judgment insofar as it relates to actual damages should be set aside. In that situation, under the circumstances here presented, we deem it our duty to examine the evidence and "give such judgment as such [trial] court ought to have given, as to the appellate court shall seem agreeable to law." Civil Rule 83.13(c), V.A.M.R. We have already determined that the "as represented" value of the farm is $208,620. Our task now is to ascertain its reasonable market value on February 1, 1956, the date of the sales contract. Three experts for defendants fixed its value at $117,100, $126,-107.50, and $126,692. An expert offered by plaintiff was of the opinion that its reasonable market value at that time was $201,300. An abundance of other evidence in the transcript is helpful in determining that issue. For example, the buildings and other improvements are described, there is evidence concerning the fertility and productivity of the soil, the available water supply, the efficiency of the natural and artificial drainage provided, and other elements which we need not detail. Upon consideration of all of the evidence we have concluded that the values fixed by defendants' witnesses are too low and the value stated by plaintiff's witness is too high. It is our finding that the reasonable market value of the farm on February 1, 1956, including the garbage feeding equipment, was $150,000. When the actual value so found is subtracted from the "as represented" value of $208,620, the result is $58,620, which is the amount of actual damages defendants should recover on Count I of their counterclaim.

■■■■ Plaintiff contends that defendants learned after six months of operation that the garbage feeding enterprise was unprofitable and that they should have mitigated the damages by stopping that operation at that time. Even if the doctrine of mitigation were applicable in this situation we would rule this contention against plaintiff. There is evidence to indicate that defendants continued to feed

garbage largely because plaintiff told them. repeatedly that their hog losses "would stop as suddenly as it started" and other similar statements, and that if it didn't stop he would rewrite the contract to take care of their hog losses. However, since the damages have been determined as of the day the farm was purchased, we do not think the rule requiring mitigation is applicable in the situation before us.

■ Defendants contend that they should have recovered the sum of $4,512.78 expended in drilling wells and laying pipe in order to provide an adequate supply of water on the farm; that they are also entitled to recover $1,692.25 expended to improve the drainage in the low land on the farm. These items come in the same classification as the items which we have held were improperly allowed by the trial court. They should not be allowed.

■ In the fall of 1961 defendants, at the request of plaintiff, sowed 41.6 acres of wheat on the farm in question. They filed a claim against the receiver in the sum of $499.71 for sowing that wheat. The court allowed the claim in the sum of $285.99. Defendants say in their brief that they are entitled to recover the remaining $213.72. They have not, however, developed the contention in their brief and have not pointed out wherein they claim the court erred. In that situation we will defer to the finding of the trial court. This point is therefore ruled adversely to the defendants.

■ Upon petition of plaintiff the court appointed a receiver, effective November 30, 1961, to "take charge" of the farm land. The court took that action because, "from its experience in the long trial of this case, and from all the evidence heard in said cause, and the possible length of time which may elapse before a final determination of all the issues can be made, it is necessary that an appointment of a receiver be made to protect the interests of all the parties hereto." The final point

briefed by defendants is that the court erred in assessing one half of the costs of the receivership against them. In its memorandum the trial court found that plaintiff became entitled to the possession of the farm on January 15, 1961, but since judgment was entered against defendants for rent at the rate of $1,000 per month for the time they retained possession thereafter, the court held that defendants were entitled to the assets in the possession of the receiver. Ordinarily, the costs of a receivership are allowed and paid out of the assets in the hands of the receiver. If that had been done in this case defendants would have had to bear all of that expense. Under the circumstances, we rule that the court did not abuse its discretion in ordering that each side pay one half of the costs of the receivership.

Plaintiff filed a motion here to dismiss the appeal of defendants because the factual statement in their brief was argumentative, in violation of Civil Rule 83.05(c), V.A. M.R. Defendants filed a motion to dismiss plaintiff's appeal for the reason that the statement of facts in his brief was incomplete and not fair and concise. We found considerable merit in both motions, but concluded that we should refrain from dismissing the appeals and have proceeded to decide the appeals on the merits. Both motions are accordingly overruled.

For the reasons heretofore stated, it is ordered and adjudged that the judgment for defendants on Count I of their counterclaim herein be modified by changing the amount of the actual damages allowed from $56,858.18 to $58,620, which, together with the sum of $25,000 allowed as punitive damages, will make a total judgment of $83,620, which sum, together with interest at 6% from March 31, 1962, it is ordered and adjudged that defendants shall recover from plaintiff.

The judgment, as modified, is affirmed.

All concur.