The JACOBS MANUFACTURING COMPANY, Appellee,

v.

SAM BROWN CO., Appellant.

No. 92–1834.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 17, 1992.

Decided March 28, 1994.

---

Loeb H. Granoff, Kansas City, MO, argued (Lawrence G. Crahan and Jerald S. Meyer, on the brief), for appellant.

Gary Lee Whittier, Kansas City, MO, argued, for appellee.

Before FAGG, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

FAGG, Circuit Judge.

This lawsuit arises from the breakdown of a distributor relationship between the Jacobs Manufacturing Company (Jacobs), a manufacturer of truck engine brakes, and Sam Brown Company (Brown), its largest distributor. After the relationship ended, Jacobs brought this diversity action for its unpaid account balance, and Brown counterclaimed asserting Jacobs made fraudulent and negligent misrepresentations. Brown appeals the district court's order granting judgment as a matter of law (JAML) to Jacobs. We affirm in part and reverse in part.

## I.

In 1976 Jacobs's representatives approached Brown's chief executive officer (CEO) to solicit Brown as a Jacobs distributor. Brown's CEO expressed concern about the distributorship agreement's one-year term and Jacobs's right to sell directly to original equipment manufacturers. The representatives responded the agreement would last a "lifetime" if Brown performed well, the only original equipment manufacturer integrating Jacobs's products in Brown's territory would be Brown's account, and Jacobs would refer to Brown all original equipment manufacturer inquiries from Brown's exclusive territory. Assured this oral understanding was also part of the agreement, Brown's CEO signed the annual distributorship agreement. Brown became Jacobs's top distributor in North America. Each year after 1976, Jacobs sent Brown a new agreement with a letter from Jacobs's general sales manager stating that he was "sure [their] continued association [would] be long term and mutually beneficial." Brown signed the agreements each year until 1984. Jacobs repeatedly reassured Brown it would be a long-term distributor and promised to inform Brown about any developments affecting Brown's distributorship and expansion effort. With borrowed money, Brown invested more than one million dollars in developing its Jacobs distributorship to comply with Jacobs request that Brown have suitable physical facilities and trained service personnel available around the clock.

Contrary to its representations to Brown, Jacobs was considering changes to its distribution system. As early as 1974, Jacobs's five-year marketing plan called for an analysis of the advantages of directly marketing and servicing its products. In 1979, Jacobs hired a consultant to develop alternative distribution plans. Without disclosing this purpose, Jacobs's vice president asked Brown to give the consultant unlimited access to Brown's premises and business records. The vice president told Brown the reason for the consultant's visit was to allow the consultant to find out how a Jacobs distributor operated. With Brown's cooperation, the consultant obtained knowledge of Brown's production and marketing practices and other confidential information, but assured Brown the information would not be disclosed.

Later, in June 1981, Jacobs received a commissioned report from a different consulting firm, Bain and Company. The Bain report stated that "[w]ith a very carefully staged, time-phased program, Jacobs could gradually eliminate almost all of the distributors." The Bain report recommended that Jacobs pursue the fleet program, eliminate the original equipment manufacturer distributor segment first, bring the distributor role in-house, and fully eliminate all external distributor segments by 1984. The report warned that to avoid loss of sales, goodwill, and image, distributors would have to be kept in place until Jacobs had its own direct sales system ready. A few days after receiving the Bain report, Jacobs executives studied the report at a hotel.

In July 1981, a month after receiving the Bain report, Jacobs encouraged Brown to continue financially supporting its Jacobs distributorship through a trucking industry recession that began in May 1980, promising Brown would be rewarded by future business when the recession ended. Jacobs's regional representative also assured Brown that their relationship was "like a marriage" and the distributorship would "go on and on." In September 1981, however, Jacobs's in-house counsel sent a written inquiry to a Jacobs executive asking whether Jacobs was "still considering a change in its distribution system [that] will enable Jacobs to go direct and eliminate all distributors and middlemen."

Behind its false front of assurances to Brown, Jacobs began to implement the Bain report's recommendations. In 1982 Jacobs started a program of direct sales to Brown's truck fleet customers. After Brown sent Jacobs a letter complaining about the program, Jacobs responded that the new program was merely a special promotion. Jacobs reassured Brown that Jacobs's short-range and long-range marketing strategies were not affected and that distributors would continue as the backbone of Jacobs's sales effort. Despite its assurances, however, Jacobs was analyzing a "Single Price Strategy" under which Jacobs would sell its products directly to any customer at the same price Jacobs charged its distributors, destroying the value of the distributorships. Nonethe-

less, Jacobs continued to urge Brown to maintain its distribution efforts through the recession, claiming both companies would benefit when the market rebounded. Jacobs's general sales manager admitted he knew about the Bain report and that Jacobs was considering changing its basic method of distribution as early as 1974, but never disclosed this information to Brown.

Consistent with the Bain report, when the recession ended in 1983 Jacobs unveiled its "Single Price Strategy," which Jacobs implemented by changing the annual distributorship agreements. Jacobs informed Brown in September 1983 that effective January 1, 1984, Jacobs would accept direct orders from original equipment manufacturers at the same prices offered to distributors, eliminate the distributors' exclusive territories, and reserve the right to sell directly to anyone at one price. Jacobs expanded its own sales and service force and in November 1983 directly solicited Brown's original equipment manufacturer and truck fleet customers, which together constituted 90% of Brown's customers for Jacobs's brakes. Jacobs fully realized the consequences of the distribution changes: Jacobs's 1983 Eastern Regional Annual Report declared, "[Jacobs's] announcement . . . of the 1984 Single Price Strategy irrevocably has changed the traditional role of our distributors. [They] must either change or die. Most will probably die."

In December 1983 Brown sent Jacobs a letter complaining that Jacobs's new policy would effectively destroy Brown's distributorship, and reminding Jacobs that Brown had incurred heavy losses during the recession based on Jacobs's assurances Brown would benefit when the market improved. Brown also stated it would be unable to recover the one million dollars it had invested in facilities and marketing for Jacobs's brakes. Jacobs did not respond to Brown's letter in writing, but a Jacobs manager noted on the letter that Jacobs should send "someone with rapport [to] visit [Brown's CEO and] give him a crumb." Because Brown could not profitably sell Jacobs's products to customers who could buy directly from Ja-

cobs at the same price, Brown refused to sign Jacobs's 1984 distributorship agreement.

## II.

Jacobs filed this diversity action against Brown for the unpaid account balance owing for products sold to Brown when the distributor relationship ended. Brown denied liability and counterclaimed, alleging Jacobs made several fraudulent misrepresentations: (1) Jacobs's statements in and after 1976 that it was not considering any plans to change its existing distribution method; (2) Jacobs's assurance in July 1981 that it had no plans to change its existing distribution method; and (3) Jacobs's statements in and after July 1981 that, if Brown remained a Jacobs distributor during the market recession, Brown's distributorship would continue when the market rebounded. Following a fifteen-day trial, the district court granted Jacobs's JAML motion on its claim against Brown, and submitted Brown's counterclaims to the jury. The jury found all three Jacobs representations were fraudulent and the third representation was also negligent. The jury awarded Brown almost $2.5 million in actual damages, consisting of out-of-pocket losses and lost future profits, and $2.7 million in punitive damages.

Sixteen months after the jury returned its verdict, the district court granted Jacobs's renewed JAML motion on Brown's counterclaims. *Jacobs Mfg. Co. v. Sam Brown Co.,* 792 F.Supp. 1520 (W.D.Mo.1992). Without the benefit of the trial transcript, the district court concluded there was no evidence from which the jury could reasonably infer that the second and third representations were false when made, *id.* at 1526, and as a matter of law, Brown could not justifiably rely on any of Jacobs's representations, *id.* at 1527. The district court vacated Brown's damage award for lost future profits, finding the profits were not proximately caused by Jacobs's first misrepresentation. *Id.* at 1530. The district court also vacated the punitive damages award, deciding the jury instruction violated due process because it did not adequately guide the jury in determining the amount of punitive damages, *id.* at 1536, the evidence did not support the award, *id.* at 1537, and the award resulted from irrational

jury behavior, *id.* The district court also granted Jacobs's alternative motion for a new trial on Brown's counterclaims. *Id.* at 1539–40.

## III.

Brown contends the district court erroneously granted Jacobs's JAML motion on Brown's fraudulent misrepresentation counterclaims. To establish fraudulent misrepresentation, Brown had to show, among other things, that Jacobs's representations were false when made and that Brown had a right to rely on the representations. *Crues v. KFC Corp.,* 729 F.2d 1145, 1148–49 (8th Cir. 1984) (applying Missouri law); *Essex v. Getty Oil Co.,* 661 S.W.2d 544, 549 (Mo.Ct.App. 1983). Brown contends that, contrary to the district court's view, the evidence supports the jury's findings that Jacobs's second and third representations were false when made and that Brown justifiably relied on all three representations. We agree.

In reviewing the district court's grant of JAML, we apply the same standard that governed the district court. *See Estwick v. City of Omaha,* 9 F.3d 56, 59 (8th Cir.1993). We consider the evidence and the reasonable inferences that may be drawn from the evidence in the light most favorable to Brown. *First Dakota Nat'l Bank v. St. Paul Fire & Marine Ins. Co.,* 2 F.3d 801, 808 (8th Cir. 1993). JAML should not have been granted unless all the evidence points one way and is susceptible of no reasonable inferences sustaining Brown's position. *Id.* at 808–09. The standard of review for JAML is the same under Missouri and federal law. *Sutherland v. Elpower Corp.,* 923 F.2d 1285, 1288 n. 6 (8th Cir.1991).

Under Missouri law, fraud may be inferred from facts and circumstances and need not be shown by direct evidence. *Glass Design Imports, Inc. v. Import Specialties,* 867 F.2d 1139, 1142 (8th Cir.1989); *Essex,* 661 S.W.2d at 551. Whether the facts and circumstances justify a conclusion that a defendant knows a representation is false when made is a question for the jury. *Essex,* 661 S.W.2d at 551. When a fraudulent misrepresentation claim is based on a statement of

intent, the plaintiff establishes falsity by showing that when the speaker made the statement, the speaker did not intend to perform consistently with the statement. *See Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1218–19 (8th Cir.1985) (applying Missouri law), *cert. denied,* 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986). Although intent not to perform cannot be shown solely by the speaker's nonperformance, intent can be shown by other evidence. *Id.* at 1219.

■ In our view, a rational jury could find the second and third representations were false when made. This is so because, viewing the evidence in the light most favorable to Brown, the jury could reasonably infer Jacobs had decided to eliminate external distributors when it made these statements to Brown. Before 1981, Jacobs concealed distribution studies and deceived Brown about the purpose of a consultant's visit. The June 1981 Bain report recommended a carefully staged, time-phased program to eliminate Jacobs's distributors by 1984. Jacobs's later conduct and timing neatly coincided with the Bain report's recommendations. We believe the jury could reasonably infer that in June 1981 Jacobs secretly adopted the Bain report's recommendation to eliminate the traditional distributors. Thus, a reasonable jury could find the second representation—Jacobs's assurances in and after July 1981 that it had no plans to change its distribution system—was untrue when made. A reasonable jury could also find that when Jacobs made the third representation, Jacobs did not intend that Brown would benefit from increased sales after the recession's end.

This leaves the issue of Brown's reliance on the three representations. Evidence that Brown continued to incur expenses to maintain its distributorship until Jacobs announced the changes in the distributorship agreement shows Brown relied on Jacobs's representations. *See Total Petroleum, Inc. v. Davis,* 788 F.2d 476, 481–82 (8th Cir.1986) (applying Missouri law). A rational jury could also find that Brown's reliance was justified. The district court held that even assuming all three representations were false, Brown's reliance on the verbal representations was not justified as a matter of law because the verbal representations conflicted with the express terms of the written distributorship agreements. *See* 792 F.Supp. at 1526–27. This view is unsupported by Missouri law, however.

■ In a Missouri fraud case, it is for the jury to decide whether a party is entitled to rely on verbal representations that conflict with a written agreement. *Pinken v. Frank,* 704 F.2d 1019, 1024–26 (8th Cir.1983); *Essex,* 661 S.W.2d at 550. Thus, Brown's reliance on Jacobs's verbal representations could be justified, even though the verbal representations contradicted the distributorship agreements' one-year terms and reservation to Jacobs of the right to sell directly to original equipment manufacturers. Although Brown also knew Jacobs was selling products directly to Brown's truck fleet customers, Brown could justifiably rely on Jacobs's assurances that the program was temporary and Jacobs's distributors would continue as the backbone of Jacobs's sales effort. It was for the jury to decide whether Brown's reliance on Jacobs's verbal representations was justified. *See Pinken,* 704 F.2d at 1024.

Because the jury's finding that all three representations were fraudulent supports the damages awarded, we need not consider whether Brown's negligent misrepresentation counterclaim was properly submitted to the jury.

### IV.

■ Brown next contends the district court should not have vacated the award for lost future profits. We agree. The district court held damages for Brown's lost future profits, i.e., "benefit of the bargain" damages, were proper under Missouri law. 792 F.Supp. at 1528–29; *see Glass Design,* 867 F.2d at 1143; *Central Microfilm Serv. Corp. v. Basic/Four Corp.,* 688 F.2d 1206, 1220 (8th Cir.1982), *cert. denied,* 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983). The district court also held the future profits were not speculative. 792 F.Supp. at 1529; *see Riddle v. Dean Mach. Co.,* 564 S.W.2d 238, 257 (Mo.Ct.App.1978). We agree with the district court's assessment of Missouri law, and Jacobs does not assert on appeal that

lost future profits are not a proper measure of damages or that future profits were speculative. The district court concluded, however, that a reasonable jury could not have found the first representation proximately caused the loss of future profits, essentially because the district court viewed Brown's reliance on Jacobs's verbal representations as unjustified. 792 F.Supp. at 1530. Having already concluded there was no evidence that the second and third representations were false when made, the district court did not consider whether they proximately caused Brown's loss of future profits. *See id.*

We believe a reasonable jury could find that Brown's loss of future profits was a direct result of Jacobs's fraudulent misrepresentations. As we have already explained, a reasonable jury could conclude that the second and third representations were false when made and that Brown's reliance on Jacobs's verbal representations was justified. Jacobs argues Brown's refusal to sign the 1984 distributorship agreement caused Brown's loss of future profits. This argument is misplaced. In the context of fraud, the purpose of "benefit of the bargain" damages is to compensate a defrauded party for amounts that would have been received if the situation had been as the defrauding party represented. *See Smith v. Tracy,* 372 S.W.2d 925, 938 (Mo.1963). Here, these damages compensate Brown for the money it would have made after the market recession ended if its distributorship had continued without change as Jacobs represented, i.e., without Jacobs's direct competition. It is clear to us that Brown's loss of future profits was a direct result of Jacobs's new distribution system, which prevented Brown from profiting from future business as Jacobs had promised Brown would. Although Brown refused to sign the distributorship agreement in 1984, Brown could not have profited even if it had signed the agreement because Jacobs's distribution changes eliminated Brown's ability to make any money. We conclude the district court abused its discretion in vacating the damages awarded for lost future profits.

Brown also challenges the district court's order vacating the punitive damage award.

The district court instructed the jury that if it found Jacobs committed fraud with "evil motive or reckless indifference to [Brown's] rights . . . , [y]ou may award [Brown] an additional amount as punitive damages to punish [Jacobs] and to deter [Jacobs] and others from like conduct." Disagreeing with the Missouri Supreme Court's decision in *Burnett v. Griffith,* 769 S.W.2d 780, 789 (Mo. 1989) (en banc), the district court concluded this instruction did not satisfy due process because it failed to guide the jury on determining the amount of any punitive damage award. 792 F.Supp. at 1533–35. Specifically, the district court held the instruction failed to tell the jury that the amount of a punitive damage award must be reasonably related to the injury inflicted and the conduct that caused the injury. *Id.*

■ Missouri case law identifies many factors, including the existence of a reasonable relationship between the amount of punitive damages awarded and the injury inflicted, that restrict a jury's punitive damage decision. *Carpenter v. Chrysler Corp.,* 853 S.W.2d 346, 365–66 (Mo.Ct.App.1993). We believe the district court was simply mistaken in holding the instruction itself must contain the limiting factors. Rather, trial or appellate court review based on the identified factors "imposes a sufficiently definite and meaningful constraint on the [jury's discretion] in awarding punitive damages" to satisfy due process. *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 22, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991); *see Carpenter,* 853 S.W.2d at 365–66. Having carefully reviewed the record, we conclude the jury's punitive damage award bears a reasonable relationship to Brown's injury. *See Finley v. Empiregas, Inc.,* 975 F.2d 467, 472 (8th Cir. 1992) (applying Missouri law). We thus conclude the jury did not abuse its discretion in fixing the amount of punitive damages. *See id.; Carpenter,* 853 S.W.2d at 365.

■ Based on its analysis of Brown's reliance on Jacobs's verbal representations, the district court also concluded the punitive damage issue should not have been submitted to the jury. 792 F.Supp. at 1537. Again wrongly rejecting Brown's reliance on verbal representations inconsistent with the written

terms of the distributorship agreement, *see ante* at 1264, the district court held a reasonable person viewing the evidence could not find Jacobs acted with reckless disregard. *Id.* Construed in the light most favorable to Brown, however, the evidence supports the jury's punitive damage award. Brown's claim for fraudulent misrepresentation was properly submitted to the jury, and the jury reasonably could find Jacobs acted in reckless disregard of Brown's rights.

The district court also held the amount of the punitive damage award was so unrealistic that it showed irrational rather than reasonable jury behavior. *Id.* Considering Jacobs's net worth of over $51 million, Brown's actual damages of nearly $2.5 million, and the continuous nature and magnitude of Jacobs's deceit, however, the $2.7 million punitive damage award is not so excessive or unreasonable that it shocks our constitutional sensibilities or could only have resulted from irrational jury behavior. *See TXO Prod. Corp. v. Alliance Resources Corp.,* — U.S. —, — — —, 113 S.Ct. 2711, 2722–23, 125 L.Ed.2d 366 (1993) (affirming $10 million punitive damage award when actual damages were $19,000).

## V.

 Brown also contends the district court should not have granted Jacobs's JAML motion on Jacobs's claim for the unpaid account balance because Brown's equitable estoppel defense should have been submitted to the jury. We disagree. Because Brown failed to plead the affirmative defense of estoppel, Brown waived it. *Ronollo v. Jacobs,* 775 S.W.2d 121, 124 (Mo.1989) (en banc). The district court thus properly granted Jacobs's JAML motion on Jacobs's claim.

## VI.

 Having decided the district court erroneously granted JAML on the liability issue, we must also consider the district court's conditional grant of a new trial. 792 F.Supp. at 1539–40. The district court held Jacobs is entitled to a new trial on the third representation because the verdicts of fraud and negligence were inconsistent. *Id.* We agree

with Brown that Jacobs waived the right to a new trial based on inconsistent verdicts, and failed to preserve the issue for our review, when Jacobs failed to object and move for resubmission before the jury's discharge. *Brode v. Cohn,* 966 F.2d 1237, 1239 (8th Cir.1992). In any event, because the first and second representations were properly submitted to the jury on the fraud theory alone and these representations support the jury's awards of compensatory and punitive damages, any inconsistency with respect to the third representation was harmless error.

The district court also granted a new trial on the ground the punitive damages award was not supported by "substantial evidence." 792 F.Supp. at 1539. Although this is an imprecise statement of the evidentiary standard for granting a new trial, the district court also correctly stated it could disturb the jury's verdict only if the verdict was against the "great weight" of the evidence, so that granting a new trial would prevent a miscarriage of justice. *Id.; see White v. Pence,* 961 F.2d 776, 780–81 (8th Cir.1992). Instead of explaining reasons for concluding a new trial should be granted on the weight of the evidence, *Pence,* 961 F.2d at 781–82, however, the district court merely stated, "For all of the reasons previously discussed, there was not substantial evidence supporting the award of punitive damages," 792 F.Supp. at 1539.

 Because the "previously discussed" reasons could only refer to the district court's analysis of the evidentiary basis for the punitive damages award when considering Jacobs's motion for JAML, *see id.* at 1536–37, it is less than clear that the district court applied the new trial standard rather than the JAML standard in granting Jacobs a new trial. If the district court applied the JAML standard, the court could not grant a new trial because "[JAML] principles have no application to the consideration of a motion for new trial on the ground that the verdict is against the weight of the evidence." *Pence,* 961 F.2d at 779. Regardless of whether the district court considered its earlier analysis of the evidence under the JAML standard or the new trial standard, however,

the evidentiary analysis was infected by the district court's legally incorrect view that Brown could not justifiably believe Jacobs's verbal representations over the written agreement's terms, *see* 792 F.Supp. at 1537, as we have already pointed out, *ante* at 1264, 1265–66. Further, if the district court used the new trial standard, the court misapplied it. The district court did not properly weigh Brown's testimony about Jacobs's verbal representations, find Brown's testimony unworthy of belief, or find a significant weight factor favoring Jacobs. *See Pence*, 961 F.2d at 781. Rather, because Brown's testimony was at odds with the written agreements, the district court concluded that "a reasonable jury could not fairly conclude [Jacobs's] conduct was either outrageous or … reckless." 792 F.Supp. at 1537. Putting the district court's misconception of Missouri law aside, this case simply involves diametrically opposed credible evidence, and it is the jury's function to choose between plausible versions of the evidence. *Pence*, 961 F.2d at 781. *Pence* makes clear that when, as in this case, reasonable persons can differ in evaluating credible evidence and the district court has not diminished the credible evidence by finding witnesses unworthy of belief or otherwise properly rejecting some of the testimony, a new trial on the ground of weight of the evidence should not be granted. *Id.* The district court could not properly grant a new trial in this case. We thus need not remand, but simply reverse the district court's conditional grant of a new trial. *See id.*

 Brown also contends the district court committed error in considering the jury's responses to special interrogatories that the district court submitted after the jury returned unambiguous verdicts. *See* 792 F.Supp. at 1540. We agree. Special interrogatories are inappropriate after the jury has returned an unambiguous verdict because "there is no reason to ask the same question a second time in a different form" or to question the jury's reasoning. *Neufeld v. Searle Labs.*, 884 F.2d 335, 338 n. 1 (8th Cir.1989). Postverdict interrogatories may imply the jury's verdict is unjustified and cause the jury to answer the interrogatories in a manner inconsistent with the verdict. Thus, the district court should not have con-

sidered the jury's answers to postverdict interrogatories in deciding whether to grant a new trial. At any rate, the district court recognized the postverdict interrogatory answers alone would not warrant a new trial.

## VII.

Accordingly, we affirm the district court's grant of JAML on Jacobs's claim and reverse the district court's grant of JAML or a new trial on Brown's fraudulent misrepresentation counterclaim. We remand to the district court with instructions to enter judgment in favor of Brown in accordance with the jury's verdict on Brown's fraudulent misrepresentation counterclaim.