CROWL DISTRIBUTING
CORPORATION,
Plaintiff,

v.

The SINGER COMPANY and Locke
Supply Company, Defendants.

No. 78–1386.

United States District Court,
D. Kansas.

July 27, 1982.

Don W. Riley, Wichita, Kan., for plaintiff.

J. J. O'Connor, New York City, Thomas D. Kitch, Wichita, Kan., for Singer.

Steven D. Gough, Wichita, Kan., Barney W. Miller, Oklahoma City, Okl., for Locke.

## MEMORANDUM AND ORDER

KELLY, District Judge.

This lawsuit was brought by Crowl Distributing Corporation (CDC), a former dis-

tributor of heating and air conditioning equipment, against the manufacturer of that equipment, The Singer Company (Singer), and against Locke Supply Company (Locke), another Singer distributor. Plaintiff seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for injuries to its business allegedly sustained by virtue of defendants' violations of the Robinson-Patman Act, 15 U.S.C. § 13, and the Sherman Act, 15 U.S.C. §§ 1–2. The case is now before the Court on defendants' motions for summary judgment; as explained below, the Court concludes that defendants have not violated the Sherman Act, and that plaintiff has suffered no injury whatsoever from any Robinson-Patman Act violations that defendants may have committed. It follows that defendants' motions must be granted.

Delbert Crowl has been in the heating and air conditioning business in Wichita, Kansas, since about 1955. Mr. Crowl's business was in the form of a partnership with his brother, Kelsey Crowl, until about 1965, when each of them formed separate businesses; Delbert Crowl operated his business as a sole proprietorship until about 1970, when he incorporated as Delbert Crowl, Inc. Throughout this period, Delbert Crowl's businesses were dealers for Singer or its predecessor, The American Furnace Company. In about 1969 Delbert Crowl arranged to become Singer distributor in a vaguely defined territory in southern and eastern Kansas; in 1971, Mr. Crowl formed Crowl Distributing Corporation, the plaintiff in this lawsuit. CDC's sole business function was to serve as Singer distributor; the other aspects of the Crowl heating and air conditioning business continued to be carried on under the banner of Delbert Crowl, Inc. Both corporations have always had the same stockholders, Delbert Crowl and his wife, and have operated at the same place of business; CDC has never had any paid employees, but has functioned, rather, through employees of Delbert Crowl, Inc. Until Singer terminated its distributorship in 1978, approximately 72% of CDC's sales were to Delbert Crowl, Inc.; among the sales not made to Delbert Crowl, Inc. ap-

proximately 49% were made to Jones Heating & Air Conditioning of Emporia, Kansas, and approximately 13% were made at cost to other Singer distributors. As a distributor, of course, CDC was able to purchase Singer equipment at a lower price than Delbert Crowl had obtained when he was merely a dealer.

Defendant Locke Supply Company is headquartered in Oklahoma City, Oklahoma, where it also maintains a large central warehouse from which all customer purchases are shipped. Locke also operates about 45 storefronts in five states. About 90% of Locke's business is in plumbing supplies, and while Singer heating and air conditioning equipment makes up less than 10% of Locke's business, it also amounts to about two million dollars annually, which is more than ten times the maximum annual sales of CDC. Locke became the Singer distributor in 1972. Plaintiff apparently first became aware of Locke in late 1975, when Delbert Crowl heard from unidentifiable persons in Wellington, Kansas, that Singer equipment could be purchased more cheaply through the Locke store in Ponca City, Oklahoma, than through plaintiff. In about July 1976, Locke opened a store in Winfield, Kansas; in promotional brochures widely distributed in conjunction with this store opening, Locke listed prices on Singer equipment that were substantially below those charged by CDC, and, in certain instances, below CDC's cost from Singer. A number of CDC's customers brought the low Locke prices to Mr. Crowl's attention; he in turn complained to Singer about Locke's invasion of his territory, and its low pricing, but was told that Singer could or would do nothing to curtail Locke's Kansas activities. CDC was terminated as a Singer distributor effective May 31, 1978.

It is not controverted that Singer gave CDC a price of 50% of "list price" and gave Locke the lower price of 48% of list price; and while Singer raises the affirmative defenses of cost justification, 15 U.S.C. § 13(a), and meeting a competitor's price, 15 U.S.C. § 13(b), it does not claim to be able to establish these defenses as a matter

of law for purposes of the pending motion, and the Court concludes that CDC has established a prima facie case of price discrimination outlawed by 15 U.S.C. § 13(a). Likewise, although Locke claims not to have known of any price discrimination, and also claims that the brokerage commission paid to its sister enterprise, Manufacturers Sales Company, was justified as a bona fide payment for actual services rendered, when the record before the Court is viewed in a light most favorable to CDC, as it must be in considering the pending motions, *see Barber v. General Electric Co.*, 648 F.2d 1272, 1276 n.1 (10th Cir. 1981), the Court cannot find that Locke has established these defenses beyond all controversy, and must therefore conclude that CDC has established a prima facie case against Locke under 15 U.S.C. §§ 13(c) and (f).

■ Nevertheless, the mere fact that plaintiff CDC may be able to establish unjustified infractions of the Robinson-Patman Act does not end the Court's inquiry. In the recent case of *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981), the Supreme Court rejected the doctrine of "automatic damages" espoused in cases such as *Fowler Manufacturing Co. v. Gorlick*, 415 F.2d 1248 (9th Cir. 1969), *cert. denied* 396 U.S. 1012, 90 S.Ct. 571, 24 L.Ed.2d 503 (1970), and held that a Robinson-Patman plaintiff "must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." 451 U.S. at 562, 101 S.Ct. at 1927. Unfortunately for CDC, it cannot establish facts beyond the price discrimination and commission payments themselves that would support an inference of injury.

To begin with, if one compares plaintiff's sales (other than those made to its retailing alter ego) in the year 1975, before Locke opened its Winfield store, 1976, the year the Locke store opened, and 1977, the first full year the ostensible competition from that store could have affected CDC, one sees that plaintiff's sales increased in 1976, and fell off in 1977 to a level still above that of 1975; moreover, if a single, very large, un-

precedented, and unrepeated sale to Dean Norris, Inc. is excluded, the pattern presented is one of a monotonic sales increase. By the same token, CDC's September 30 fiscal year balance sheet figures show a progression from a loss in 1975 of some $12,000.00 to a profit in 1976 of nearly $13,000.00 to a profit in 1977 of over $24,-000.00. The suggestion that Locke's "competition" had no adverse affect on CDC is buttressed by the fact that through 1978 Locke had not managed to make a *single* sale to *any* of plaintiff's past customers; and further buttressed by the fact that plaintiff's most intensive and systematic attempts to acquire new customers outside of the immediate Wichita area—efforts made by Crowl salesman George Wood in early 1975—were equally unsuccessful as efforts made after Locke's entry on the scene. And, with a single exception noted below, CDC cannot identify any potential customers that it lost to Locke.

In rebuttal, CDC points to an ostensible lost customer, Bobby Linker, of Winfield, Kansas, in an attempt to establish that CDC was injured by the alleged Robinson-Patman Act violations of Singer and Crowl, and indeed, Mr. Linker's deposition testimony does reveal that Locke's presence on the scene was a likely factor in Mr. Linker's decision not to deal with CDC. But Mr. Linker did not buy from Locke either, and his reasons for rejecting Singer equipment altogether, as given in the following passage from his deposition, are illuminating:

Q. And shortly after [Mr. Linker's discussions with Mr. Crowl] Locke Supply opened in Winfield?

A. . . . [W]hen this happened, as I said before this is when I decided I didn't want any of the Singer equipment. I'll go further with that if I may.

Q. Sure.

A. Due to the fact that anybody that wanted a piece of equipment from Locke could walk into the store and buy it.

Q. Without a middleman of any kind?

A. They didn't have to have a dealer or distributor. A homeowner could

walk in and buy it. I have run into those occasions where they were not a licensed plumber or heating or air conditioning man.

Q. Why was that upsetting? Why did that pose a problem?

A. You're an attorney. If everybody could represent themselves, we wouldn't need you. That is the reason. If I buy a license and maintain a business and truck and employees, that's my livelihood. If everyone can walk in and buy it, what's the purpose of selling their equipment? I asked this store manager right here, I said if you want your equipment represented in this area and a good job and take care of service, give me this area; I'll sell your equipment and take care of it. He said we can't do that. We sell it to anyone. They do.

Linker Deposition at 8–9.

Thus, while it might be said that, in this instance, the Locke store in Winfield cost CDC Bobby Linker's business, the necessary causal relation to the purported price discrimination is missing.[1] Thus, while CDC may be able to establish that Locke's *presence* injured it, that is insufficient; it must establish, rather, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). The Court does not understand CDC to contend that the Robinson-Patman Act, or indeed any of the antitrust laws, prohibits Locke from selling equipment cheaply to the ultimate consumer, notwithstanding CDC's characterization of this practice as "unethical."

Plaintiff's second attempt to parry the thrust of defendants' motions is based on the opinion letter of its expert witness, Dr. Frederic Kraft, which states that the "pos-sibility very clearly exists" that CDC lost business because of defendants' alleged Robinson-Patman Act violations. This letter does not suffice to keep CDC in the lawsuit for two reasons: first, expert testimony as to the "possibility," as opposed to "probability," of injury would not appear to meet F.R.C.P. Rule 56(e)'s requirement that a properly supported summary judgment motion be opposed by admissible evidence; second, Dr. Kraft's opinion begs the question of competition between CDC and Locke, and is premised on the supposition that had CDC been given Locke's lower price, its sales and/or profits would have increased. This is, of course, an economic truism, but it does not establish competitive injury of the type the Robinson-Patman Act was designed to prevent. The problem with Dr. Kraft's premise is sufficiently illustrated by imagining that Locke were a distributor whose commercial activities were limited to Hawaii; one could equally well say that had CDC had that Hawaiian distributor's low price, its sales would have been greater, despite the impossibility of competition between the two. As Justice Cardozo explained in discussing the similar price discrimination prohibitions established by the Interstate Commerce Act, "The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less." *Interstate Commerce Comm. v. United States*, 289 U.S. 385, 390, 53 S.Ct. 607, 609, 77 L.Ed. 1273 (1933). Dr. Kraft addresses only the first, irrelevant question.

■ The absence of any demonstrable injury also disposes of plaintiff's purported claims under the Sherman Act, 15 U.S.C. §§ 1–2, but even if some injury resulting from defendants' Robinson-Patman violations were established, CDC's Sherman Act claims would be meritless. These claims are based on a purported conspiracy between defendants to maintain CDC as dis-

---

1. To be sure, Mr. Linker was also unhappy with Locke's low prices. But in the light of the quoted testimony, it would be completely unreasonable to suppose that had CDC and Locke had the same prices, Mr. Linker would have been willing to compete with someone who would in essence be selling at retail, but at Mr. Linker's cost rather than below it.

tributor in Wichita while turning over its territory to the south to Locke; the obvious response is that it would not have been unlawful per se for Singer and Locke to have accomplished this change in territory directly, *Continental TV, Inc. v. GTE Sylvania*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Moreover, such activities affect only intrabrand competition, and given the obvious incentives facing Singer, the manufacturer, may be presumed to enhance interbrand competition, which has always been the primary concern of the Sherman Act. *See Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83, 87 (5th Cir. 1978). Of course, price discrimination per se has never been considered to fall within the scope of the Sherman Act, *see State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 462–64, 381 N.Y.S.2d 426, 427–28; 344 N.E.2d 357, 358–59 (1976); indeed, the Robinson-Patman Act was enacted precisely in order to fill a perceived loophole in the pre-existing antitrust laws. *See generally* F. Rowe, Price Discrimination Under the Robinson-Patman Act, 11–23 (1962). While it is possible that in primary-line injury cases there may be some overlap between the Robinson-Patman violations and Sherman Act "predatory pricing", *see* P. Areeda, Antitrust Analysis, ¶ 710(e) (3d. Ed. 1981), the Court has been unable to unearth any authority that even hints at the possibility that the Sherman Act prohibitions might encompass secondary-line price discrimination such as alleged here.

IT IS ACCORDINGLY ORDERED that defendants' motions for summary judgment be granted and this case be dismissed in its entirety.