Arlo ESSEX and Arlo Essex, Inc., Appellants,

v.

GETTY OIL COMPANY, Successor to Skelly Oil Company, Respondents.

No. WD 33749.

Missouri Court of Appeals, Western District.

Aug. 30, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 29, 1983.

Application to Transfer Denied Jan. 17, 1984.

Gene P. Graham, Michael W. Manners, Independence, for appellants.

Charles L. Bacon, John T. Martin and Laurel H. Corn, Shook, Hardy & Bacon, Kansas City, William T. Robbins, Tulsa, Okl., for respondents.

Before CLARK, P.J., and DIXON and NUGENT, JJ.

CLARK, Judge.

Plaintiffs-Appellants Essex had jury verdicts on a multi-count petition for $23,-300.00 actual damages and $2,150,000.00 punitive damages. On the post-trial motions of defendant-respondent Skelly, the trial court entered judgment n.o.v. for defendant and, in the alternative, ordered a new trial.

We affirm in part, reverse in part and remand for further proceedings.

Plaintiffs pleaded two causes of action in four counts, the first three counts based on fraudulent misrepresentations and the fourth count for unfair competition. All claims grew out of agreements whereby plaintiffs had leased automobile service stations from Skelly to operate at two locations in Independence. For convenience, the facts are separately summarized as to each location. In stating the facts, evidence and inferences favorable to the jury's verdicts are accepted as true and contrary evidence and inferences are disregarded. *Grant Renne & Sons, Inc. v. J.E. Dunn Construction Company,* 633 S.W.2d 166, 168 (Mo.App.1982).

I.

THE 23RD STREET STATION

In 1968, Arlo Essex[1] was a successful service station operator in the Independence area having acquired a following of customers through the conduct of that business for more than ten years. Essex was approached in 1968 by one Jerry Meadors, a territorial representative for Skelly, to seek Essex out as a lease operator for a Skelly station then under construction. (Referred to hereafter as the 23rd Street Station). After discussions lasting several months, Essex agreed to terminate his existing lease of an Apco station and enter into a lease with Skelly for the 23rd Street station. Before the transaction was completed, Meadors was replaced as Skelly territorial representative by one Gary Leabo. The lease arrangement was actually finalized December 1, 1969 between Essex and Leabo.

During the course of negotiations, Essex expressed concern to Meadors and Leabo about a clause in the proposed Skelly lease giving either party the option to cancel the lease on 30 days notice. Essex was reluctant to leave his successful operation under Apco without security that Skelly would

1. The individual and corporate plaintiffs are considered here as a single entity. There was no issue at trial and none here suggesting that the corporate plaintiff was other than a vehicle of business convenience for Essex.

not arbitrarily exercise the cancellation privilege. Both Meadors and Leabo assured Essex the language in the lease was merely a formality and if Essex ran a good operation, he could remain in the location until he decided to retire.

According to Leabo, at the Skelly training program for territorial representatives, he and others were instructed to overcome resistance prospective lessees might express about the cancellation clause by saying that the clause would not be used to terminate a lease unless good cause by reason of unsatisfactory performance of the lessee gave actual grounds to seek another station operator. Essex operated the 23rd Street Station to the apparent satisfaction of Skelly until April, 1973 when he was contacted by one McKinney, the successor representative to Leabo. McKinney informed Essex that Skelly was assuming control of the station and was terminating Essex's lease the next day. No charge of unsatisfactory operation of the station was made against Essex and, as subsequent events demonstrated, the reason for the termination was a decision by Skelly to convert the station into a self-service operation under the name of a Skelly subsidiary, Surfco.

Essex refused to vacate the station on one day's notice and refused to sign a mutual termination agreement tendered to him by Skelly a few days later. On April 30, 1973 Skelly delivered to Essex a formal termination notice in accordance with the lease provision requiring Essex to vacate in 30 days. Essex complied. As evidence of damage, Essex offered proof of the expense required for him to relocate his business and the loss he sustained on an inventory of Skelly products which Skelly refused to repurchase.

## THE SPRING AND MAPLE STREET STATION

In the summer of 1971 while Essex was still operating the 23rd Street Station, Leabo initiated a discussion about operation of a Skelly station at Spring and Maple Streets. (Referred to hereafter as the Spring and Maple Station). The existing building and improvements had been in place many years and were in poor condition, but Leabo told Essex a new station was to be constructed on the site that Fall or in the early part of 1972. Leabo displayed blueprints of the new structure. Because of the contemplated new construction, Essex understood no repairs would be made to the old structure.

Upon the promise a new station would be built, Essex assumed operation of the Spring and Maple station by an agreement signed September 26, 1971, adding it to his lease of the 23rd Street Station. Despite continuing assurances to Essex by Skelly representatives during the next four years, however, no new construction was commenced at the Spring and Maple location. Undisclosed to Essex was a decision made by Skelly in May, 1972 to suspend all new filling station construction. Eventually, in 1976, Essex bought the location from Skelly and renovated it himself.

During the period from 1971 to 1976, Essex encountered difficulty with the Spring and Maple station associated with the lack of repair. Only two of the four gasoline pumps operated, the roof leaked, the underground storage tanks had water seepage and the blender pumps dispensed an improper gasoline mixture. In addition, heating costs were unnecessarily high and the external appearance was unsatisfactory lacking commercial appeal. Damages claimed by Essex consisted of loss of profits and loss of customers attributable to the condition of the Spring and Maple station and the failure of Skelly to replace the structure as represented to Essex when the lease was negotiated.

The first three counts of plaintiff's petition claimed damages recoverable on the ground of fraudulent misrepresentations made by Skelly agents Meadors and Leabo, first as to the import of the lease cancellation clause and second, as to Skelly's plans for erecting a new service station at Spring and Maple. The theory underlying Counts I, II and III was the same, only the facts varied as to each count.

Count IV claimed damages by reason of unfair competition on the part of Skelly when it assumed operation of the 23rd Street Station under the Surfco subsidiary and entered into competition with Essex for customers in the area. The factual basis for the claim included the supply of products to Surfco at lower prices than Skelly charged Essex, the appearance of the Surfco station as a regular Skelly station offering self-service and the sale of an inferior and cheaper grade of gasoline branded "regular" in competition with the regular gasoline sold by Essex.

## II.

The several causes of action and the related points raised on appeal subdivide readily between the theories of fraudulent misrepresentation and of unfair competition and they will be so treated in the subsequent discussion. The sequence of counts will be followed and appropriately noted. Also in the order taken up will be first, the entry of judgment n.o.v. on the respective counts and second, as to Counts I, II and III, the alternative orders of the trial court granting Skelly new trials as to those counts.

## FRAUDULENT MISREPRESENTATION

### COUNT I.

The first count of plaintiffs' petition asserted that Skelly induced Essex to lease the 23rd Street Station by the fraudulent misrepresentation of Skelly's intention regarding the 30 day cancellation clause in the lease. Plaintiffs' evidence, if believed, supports the conclusion that Skelly's representatives told Essex the clause was merely a formality and that Essex could remain in the station as long as he chose to do so if he "ran a good operation." The evidence also supports a finding that the representation made to Essex was a calculated plan by Skelly to distract attention from the clause which Skelly fully intended to utilize if cancellation of the lease would operate to Skelly's advantage.

The trial judge in his "Findings of Fact and Conclusions of Law" entered on defendant's motion for judgment n.o.v., held that these facts, even if proven, state no cause of action on which relief may be granted. In the language of the order, "It is the belief of this Court that such statements, even if made, do not constitute a fraudulent inducement to enter into the contract." The trial judge was apparently of the opinion that the written document should prevail regardless of external proof concerning inducements, representations or circumstances. In this conclusion, the trial court was mistaken.

■ The effect of a written contract is to merge all prior negotiations into the contract which may not then be varied or contradicted by parol evidence. This rule, however, has no application where it is claimed that fraudulent representations induced the party to enter into the contract. *Countess v. Strunk*, 630 S.W.2d 246, 254 (Mo.App.1982). Where fraud is, as here, the basis for the cause of action, the submissibility of the case depends not on the content of the written agreement, as the trial court concluded, but whether the plaintiff has established the nine elements of fraud. These are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) the speaker's intent that his statement be acted upon; (6) the hearer's ignorance of the falsity of the statement; (7) his reliance on the truth of the statement; (8) the hearer's right to rely on the statement; and (9) the hearer's consequent and proximate injury. *Weaver v. Travers*, 631 S.W.2d 81, 83 (Mo.App.1982).

■ Perhaps in tacit recognition that the action of the trial court is not sustainable on the ground set out in the judgment, Skelly contends on this appeal that Essex failed to make a case of fraud because there was insufficient proof Essex had a right to rely on the statements of Meadors and Leabo, or that Meadors and Leabo knew the statements were false when made or that Essex suffered damage. In reviewing these questions of evidentiary sufficiency, a judg-

ment n.o.v. presents the same issue as a verdict directed at the close of the evidence. *Dockery v. Mannisi,* 636 S.W.2d 372, 376 (Mo.App.1982). A verdict directed against the plaintiff will be reversed on appeal unless the facts and inferences are so strongly against the plaintiff as to leave no room for reasonable minds to differ. *Beshore v. Gretzinger,* 641 S.W.2d 858, 862 (Mo.App. 1982).

■ Considering first the evidence of Essex's entitlement to rely on representations by Meadors and Leabo, it is to be recognized that persons must exercise ordinary care and prudence for their own welfare. What amounts to reasonable prudence and diligence depends on the nature of the transaction, the respective knowledge and means of knowledge of the parties, the form and materiality of the representation and other factors. *Hanson v. Acceptance Finance Co.,* 270 S.W.2d 143, 149 (Mo.App. 1954). Where a distinct and specific representation is made to be acted upon, however, and action is induced, the representee has the right to rely on the representation even if the parties stand upon an equal footing or have equal knowledge or means of information as to the subject matter or even if the representation is one not calculated to impress a person of ordinary prudence. *Cantley v. Plattner,* 228 Mo.App. 411, 67 S.W.2d 125 (1934) cited in *Cantrell v. Superior Loan Corp.,* 603 S.W.2d 627, 637 (Mo.App.1980). So, too, is the representee entitled to rely when he lacks equal facilities for learning the truth and where the facts are peculiarly within the knowledge of the speaker and are difficult for the representee to ascertain. *Cotner v. Blinne,* 623 S.W.2d 615, 619 (Mo.App.1981).

In the subject case, a specific representation was made to Essex responsive to his inquiry about the cancellation clause. The purpose of the representation was to persuade that the clause was of no moment and to induce Essex to sign the lease. Essex had no means of determining the falsity of the representation, a fact only known to Skelly officials.

■ It has long been the settled law in Missouri that a state of mind or intent is an existing fact, the misrepresentation of which can constitute fraud. *White v. Mulvania,* 575 S.W.2d 184, 188 (Mo. banc 1978). In a case of similar facts involving the lease of a gasoline service station, *Sagehorn v. Phillips Petroleum Co.,* 648 S.W.2d 647 (Mo. App.1983), it was the plaintiff's claim that he relied on assurances by Phillips his station lease would be continued as long as his performance was satisfactory. The lease signed by Sagehorn included a ten day cancellation clause which Phillips used to remove Sagehorn. The court observed that whether Sagehorn was entitled to rely on the representation was for the jury to decide.

■ In this case, there was evidence of the representation made to Essex by Meadors and Leabo as they had been instructed to do when a prospective lessee questioned the cancellation clause. There was also evidence, by reason of Skelly's later conduct, from which a jury could conclude that Skelly intended from the outset of the lease to use the cancellation clause. Under these facts it was for the jury to decide whether Essex was entitled to rely on the representation and, conjunctively, whether the representation was false.

Skelly next contends that Essex failed to prove the fourth element of a fraud case, that Meadors and Leabo knew when they told Essex he could keep the station as long as he performed satisfactorily that the statement was false. Indeed, the record indicates Meadors and Leabo were only doing what they had been taught at sales instruction courses and were following Skelly policies intended to meet competition for station operators. This argument, however, proceeds on the false assumption that Skelly may escape liability if the person who made the communication has been insulated from guilty knowledge.

■ A recovery can be had for false representations made to another with the intent they be communicated to a third person for the purpose of defrauding the third person. The fact that the person used

as an agent to convey the representation is innocent does not relieve the party charged with fraud. *Wilson v. Murch,* 354 S.W.2d 332, 337 (Mo.App.1962). Fraud is rarely susceptible of positive proof and may be established by a showing of facts and circumstances from which it reasonably and fairly may be inferred. *Cantrell v. Superior Loan Corp., supra,* 603 S.W.2d at 634–635. Whether the facts and circumstances and the defendant's conduct justify a conclusion that the defendant knew the representation was false when made is a question for the jury under proper instruction. *Mills v. Keith Marsh Chevrolet, Inc.,* 549 S.W.2d 604, 608 (Mo.App.1977); *Horigan Realty Co. v. Honan,* 275 S.W. 949, 955 (Mo.1925).

■ Here, the question was whether Skelly agents acting through Meadors and Leabo as intermediaries procured a lease agreement from Essex on the false representation that Skelly would not use the termination clause. The circumstances of the training sessions for territorial representatives, such as Meadors and Leabo, and the subsequent conduct of Skelly in replacing Essex with a Skelly subsidiary were sufficient facts to take the issue to the jury. It was for the jury to decide whether a fraudulent misrepresentation, known by Skelly to be such, was made.

Finally, Skelly contends Essex proved no damage by reason of termination of the 23rd Street station lease but, to the contrary the evidence showed Essex improved his status by moving to a Phillips station where his operation showed increased profit. Plaintiffs' evidence on the subject was that relocation of his service station operation involved an investment of $10,000.00 to $15,000.00 which was borrowed at interest. Extra employees were hired to make the move and the Skelly inventory, which Skelly refused to repurchase, was sold at a loss. Without attempting to place an exact dollar amount on the actual damages proven, it suffices to say that actual loss was unquestionably demonstrated.

■ The contention that Essex in effect must offset the gain from later business success against the loss attributable to the

fraud practiced by Skelly finds no support in the case authority. In *Louis Steinbaum Real Estate Co. v. Maltz,* 247 S.W.2d 652 (Mo.1952), the plaintiff claimed fraud practiced against it in the sale of a building. The defendant attempted to refute plaintiff's claim of loss on the transaction by showing plaintiff later sold the building at a profit. The court held the measure of plaintiff's damages is not to be decreased because of subsequent advantage acquired. Damages are to be measured at the time of the transaction. *Auffenberg v. Hafley,* 457 S.W.2d 929, 937 (Mo.App.1970).

■ In summary, plaintiffs' evidence, taken as true, was sufficient to prove a fraudulent misrepresentation by Skelly, the effect of which was to entitle plaintiffs to recover when Skelly invoked the lease cancellation clause to oust plaintiffs from their tenancy. Plaintiffs were entitled to rely on the representations, there was inferential proof Skelly knew the representations were false and plaintiffs proved some actual damages sustained. The trial court therefore erred in entering judgment n.o.v. for defendant as to Count I.

## FRAUDULENT MISREPRESENTATION

### COUNTS II AND III

The second count of plaintiffs' petition claimed damages for breach of Skelly's representation, made to induce execution of the lease for the Spring and Maple station, that construction of a new station would begin no later than the Spring of 1972. Count III of the petition also claimed damages as to the Spring and Maple station, but was based on Skelly's continuing representations after the Spring of 1972 that a station would yet be built. In both counts, it was alleged the representations were false, that they were known by Skelly to be untrue when made and that plaintiffs in consequence suffered damages.

The trial court entered judgment n.o.v. for defendant as to Count II for essentially the same reason expressed in the judgment as the basis for its ruling on Count I, that

is, plaintiffs could not recover in the absence of an express provision in the lease promising construction of the new service station. The ruling was in error in a case grounded in fraud, the reasons and authorities being the same as those set out above relative to Count I. Again, however, Skelly seeks to uphold the result by contending Essex did not adduce evidence sufficient to show a right to rely on the representations, or that Skelly knew the representations were false or that any damage was proved.

The plaintiffs' evidence as to Count II established that Skelly approached Essex about a lease of the Spring and Maple station and from the outset of discussions, sought to persuade him to enter into the lease on the basis that a new station was to be built. The existing facility was in poor repair and was unattractive to customers and uneconomical to operate. Indeed, the prime consideration for Essex's interest in the proposal was the new facility illustrated on plans exhibited to Essex by Leabo. These were ample to warrant submission of the cause to the jury. Whether reliance on the representations was justified under the circumstances was for the jury to decide. *Cantrell v. Superior Loan Corp., supra.* Whether Leabo had actual or apparent authority to make the representations was scarcely debatable under the evidence as presented. In either event, however, the point is irrelevant in a case of fraud. *Tietjens v. General Motors Corp.,* 418 S.W.2d 75 (Mo.1967).

The evidence tending to prove Skelly's knowledge that the representations about construction of a new station were false was substantial. At the time of Leabo's conversations with Essex, Skelly executives expressed skepticism about the project. The Skelly district manager for the Kansas City area deemed the construction unwise. In December, 1971, Skelly contemplated not building and in May, 1972, Skelly imposed a moratorium on new construction. Commencing in 1973, Skelly began attempts to sell the station. This proof was adequate, if believed, to entitle a jury to find Skelly knew from 1971 to 1976 that the representations by Leabo were false or, alternative-

ly as the jury was instructed, Skelly did not know if the representations were true or false.

■ As to the question of damages proven on Count II, plaintiffs were permitted to amend their petition to a prayer for $1.00 actual damages when Essex's testimony about lost profits was excluded as speculative. Other testimony about poor lighting and appearance of the station, the lack of a Skelly sign and the temporary closing of car wash facilities at least established nominal damages which are sufficient to sustain an action for fraud. *Auffenberg v. Hafley, supra.*

■ In summary, as to Count II, the evidence viewed most favorably to plaintiffs established that Skelly induced Essex to enter into the lease of the station at Spring and Maple by fraudulently misrepresenting to Essex an intention by Skelly to construct a new station at the location by the Spring of 1972. The existing station was not an acceptable facility for lease without the inducement which the promise of new construction added. Plaintiffs were, under the circumstances, entitled to rely on Skelly's statement of its intent to build the new facility. As to the knowledge of Skelly, the jury was instructed a verdict for plaintiffs depended on proof Skelly either knew no new station would be built, or did not know one way or the other. There was at least proof Skelly had made no firm decision on construction by 1971 and had abandoned construction by 1972. Finally, there was proof plaintiffs sustained, at a minimum, nominal damages. The trial court therefore erred in entering judgment n.o.v. for defendant as to Count II.

The third count of the petition relied as a basis for recovery on representations made by Skelly to Essex after the Spring of 1972 that a new station would yet be built. Such representations were ostensibly made to induce plaintiffs to continue operating the Spring and Maple station despite the failure of the earlier promise to build the new facility. In fact, by 1972, Skelly had imposed a moratorium on new construction

and had no plan to build at Spring and Maple.

The trial court by its order denied plaintiffs the benefit of their jury verdict on Count III on the conclusion that Counts II and III were indistinguishable and stated only one cause of action. The pleading, the proof and the submission all demonstrate that the two counts were separate and distinct and presented different aspects of claims and losses arising out of the Spring and Maple station lease.

Again recounting the evidence in the light most favorable to plaintiffs, it became apparent early in 1972 after Essex had entered into possession and was operating the Spring and Maple station, that a new station was not to be built in the period originally contemplated. For the purpose of overcoming resistance by Essex to continued operation of the facility without major repairs, Skelly gave added and continuing assurances that the construction had only been delayed. Count III, distinguishable from Count II, presented a claim based on these fraudulent misrepresentations and the damages suffered from the Spring of 1972 until plaintiffs finally acquired and remodeled the station in 1976. The jury instructions hypothesized the different factual basis for recovery under Counts II and III and separated the damages by the respective time periods applicable to each count.

■ In *Rotert v. Peabody Coal Co.,* 513 S.W.2d 667 (Mo.App.1974), plaintiff sued for damages caused by defendant's blasting operations which had continued during a one year period. One count was for damage to buildings, another was for lost business profits and a third was for depreciation in land values. Denying defendant's contention that but one cause of action was presented, the court stated that the same cause of action could be presented in separate counts so as to meet different phases of the evidence or different legal views. The same principle is applicable here, primarily because each count relied on different representations and covered a different time interval.

Turning to the sufficiency of the evidence to justify submission of Count III to the jury, much of the discussion above as to Count I and Count II is applicable. Although Skelly questions the right of Essex to rely on the statements by the Skelly representatives, that issue was for the jury to resolve. The falsity of the representation, particularly after May, 1972 was evident from Skelly's own record. Plaintiffs presented particular evidence of damage including a $3,000.00 loss due to a faulty blender pump which improperly mixed premium and regular gasoline. Also offered was evidence showing the loss of trade from specific customers because of water in the gasoline.

■ The trial court's order as to both Counts II and III also purported to be based on a finding by the trial court that proof which Skelly offered as to substantial expenditures made in planning for the new station at Spring and Maple streets demonstrated a lack of credibility in plaintiffs' assertion of fraud. The court expressed disbelief of any motive which could prompt Skelly "to lure plaintiff into some unknown and unexplained position." This added ground was not appropriate to consideration of defendant's motion for judgment notwithstanding the jury verdicts. Where there is uncertainty arising from a conflict in the testimony or because, the facts being undisputed, fair-minded men would honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury. *Brown v. Gamble Construction Co., Inc.,* 537 S.W.2d 685, 687 (Mo.App.1976).

In summary, the plaintiffs' evidence was sufficient to prove as to Count III that Skelly continued after April, 1972 to represent to Essex that a new station would be built at Spring and Maple, that Skelly had no intention after April, 1972 to build any new stations and that, in reliance on the false representation, Essex continued to operate the station as it existed in disrepair, suffering as a consequence the damages shown in the evidence. The trial court

therefore erred in entering judgment for the defendant n.o.v. as to Count III.

## UNFAIR COMPETITION

## COUNT IV

The last count of the petition dealt with the circumstances prevailing after Skelly had resumed control, through its subsidiary Surfco, of the 23rd Street station, but while Essex was still operating the Spring and Maple station as a Skelly lessee. Plaintiffs claimed damages on the ground of price discrimination and unfair competition because Skelly gave Surfco a wholesale price advantage and in other ways stimulated customers to transfer their business from the Spring and Maple station to the Surfco station a few blocks away. The trial court entered judgment n.o.v. for defendant on Count IV on the stated ground that plaintiffs' evidence did not support "any statutory violation or restraint of trade or commerce."

■ Plaintiffs' Count IV claim was in the alternative. The primary submission was for violation of the Missouri Anti-Trust Statute, Chapter 416, particularly § 416.-031, RSMo 1978. Plaintiffs also submitted their claim under the doctrine of common law unfair competition. The question is whether price discrimination, if proven, supports a claim under the Missouri Anti-Trust statute or is a cause cognizable in Missouri as unfair competition. We conclude the law in Missouri affords no relief in either alternative.

The sections of the statute applicable here are:

"Section 416.031.1. Every contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful."

"Section 416.141. Sections 416.011 to 416.161 shall be construed in harmony with ruling judicial interpretations of comparable federal anti-trust statutes."

No Missouri authority has been cited by plaintiffs holding price discrimination to be a violation of § 416.031.1, RSMo 1978 and independent research has disclosed none.

We therefore look to federal law for guidance as instructed by § 416.141, RSMo 1978. This latter provision was intended to serve this purpose, that is to provide a ready body of precedent for interpreting the state anti-trust statutes. *Metts v. Clark Oil & Refining Corp.,* 618 S.W.2d 698, 701 (Mo.App. 1981).

The language of the Missouri statute is virtually identical with the Sherman Anti-Trust Act, 15 U.S.C., § 1 (1980). It has been held under federal law that the Sherman Act does not include cases of price discrimination.

"Of course, price discrimination per se has never been considered to fall within the scope of the Sherman Act, see *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 462–64, 381 N.Y.S.2d 426, 427–28; 344 N.E.2d 357, 358–59 (1976); indeed, the Robinson-Patman Act was enacted precisely in order to fill a perceived loophole in the pre-existing anti-trust laws. See generally, F. Rowe Price Discrimination Under the Robinson-Patman Act, 11–23 (1962)." *Crowl Distributing Corp. v. Singer Co.,* 543 F.Supp. 1033, 1037 (D.Kan.1982).

While price discrimination may tend to limit trade or competition, as the authority cited by plaintiffs hold, *Peelers Co. v. Wendt,* 260 F.Supp. 193, 198 (W.D.Wash. 1966), plaintiffs here made no claim of monopolistic practice, only the restraint of trade claim under § 416.031.1, RSMo 1978. The *Peelers Co.* case recognizes that price discrimination is governed by Robinson-Patman, and only where the continued practice results in a monopoly or attempt to monopolize trade does a Sherman Act violation occur. Section 416.031.2 of the Missouri law is comparable to § 2 of the Sherman Act, but as noted above, plaintiffs here asserted no § 2 claim.

Significantly, Missouri has adopted no law comparable to the Robinson-Patman Act, except as to the sale of milk, §§ 416.-410 *et seq.,* RSMo 1978. The absence of any Missouri law prohibiting price discrimination generally is to be inferred from the statute controlling bulk sales of milk under the doctrine that express mention of one

thing in the statute implies the exclusion of another. *Harrison v. MFA Mutual Insurance Co.,* 607 S.W.2d 137, 146 (Mo. banc 1980).

Under the same facts, plaintiffs presented the alternate submission of Count IV as a common law action for unfair competition. Plaintiffs argue that flexibility of the doctrine accommodates the circumstances here where the product sold by Surfco as "Skelly Regular" was in fact inferior to the same branded product sold by Essex. Plaintiffs cite no Missouri case holding the common law cause of action for unfair competition to include this situation and independent research has disclosed none.

It is true that the scope of the unfair competition doctrine has been enlarged in more recent cases, but the basic concept yet retains the attribute of misappropriation. Originally, the theory was applicable only to cases where the offending party used the name and reputation of another to "palm off" his product, usually an inferior item. Now, however, any scheme which misappropriates the property of another may lie within the protection of the doctrine. As the court announced in *National Broadcasting Co., Inc. v. Nance,* 506 S.W.2d 483, 484 (Mo.App.1974), unfair competition is a species of commercial hitchhiking which the law finds offensive. All attempts to trade on another's reputation are outlawed in a reaffirmation of the rules of fair play.

The present case does not conform to this pattern. The products sold by Surfco and by Essex were all Skelly merchandise and were represented to be and were branded as such. Surfco did not attempt to trade on the name or reputation of Essex, but merely offered Skelly products in competition with Essex. The fact that some customers of Essex may have taken their business to Surfco because of price differences does not amount to misappropriation as defined in the concept of unfair competition. If Surfco sold an inferior grade of regular gasoline without alerting customers that all branded regular gasolines are not of the same composition, a cause of action may have accrued to the customers, but those facts make no

case of unfair competition for Essex under existing Missouri law.

In summary, plaintiffs did not prove a cause of action for unfair competition under the pleaded theories of Count IV, a statutory cause or a common law cause, and the trial court correctly entered judgment n.o.v. for defendant on this count.

### III.

### ACTUAL AND PUNITIVE DAMAGES

The jury awarded Essex actual and punitive damages as to Count I, nominal damages only as to Count II, and $20,000.00 actual damages and no punitive damages as to Count III. The damage award as to Count IV is irrelevant because of the conclusion plaintiffs made no case on that count.

In its motions for judgment n.o.v., Skelly contended it was entitled to judgment because plaintiffs' evidence was generally deficient in proof of any damage and that punitive damages were not recoverable for want of proof of legal malice. The trial court made no mention of these contentions in its findings and is therefore presumed to have overruled them. *Smith v. St. Louis Public Service Co.,* 277 S.W.2d 498 (Mo. 1955). As it is entitled to do, Skelly argues here that the points should be considered as a basis for sustaining the order of the trial court.

The general assertion that proof of actual damages was lacking has been separately dealt with in the previous serial consideration of each count and will not be repeated. In particular, however, Skelly argues that even if Arlo Essex Inc., the corporate entity which leased the stations proved actual damages, there was no evidence Arlo Essex the individual made any contract with Skelly or bought or sold any Skelly products. It is therefore contended that judgment n.o.v. against Arlo Essex the individual should, at a minimum, be sustained.

In an earlier footnote to this opinion, it was observed that Arlo Essex, the individual, had no practical identity apart from Arlo Essex, Inc. for purposes of resolving sub-

stantive issues, and the dual designation of plaintiffs was disregarded. In the context of judgment responsibility, however, defendant is entitled to raise the issue of plaintiff identity, did so in the trial court and reasserts the point here. Unfortunately, the trial court ignored the problem and here, Essex merely argues that defendant has shown no prejudice by reason of the judgments rendered jointly in favor of the individual and corporate plaintiffs. As will hereafter appear, the problem is of consequence only as to Count I because Counts II and III must be retried and the judgment n.o.v. in favor of Skelly on Count IV is affirmed.

The submission as to Count I left the jury no alternative to choose between the two plaintiffs, the record shows no issue of overlapping or distinguishable claims of damages and thus, in finding for the plaintiffs, the jury merely returned its verdict in favor of "Arlo Essex and Arlo Essex, Inc." Apart from the contention that only one of the two plaintiffs was entitled to judgment, Skelly makes no contention that the presence of conjunctive plaintiffs itself impaired proof of damages. It does contend, as earlier noted, that such proof as there was, showed no damages to Arlo Essex, the individual.

Review of the exhibits in the case shows that the lease of the 23rd Street Station was to Arlo Essex, the individual, correspondence from Skelly was to him and the cancellation notice was to Arlo Essex. In fact, there is little if any suggestion in this record that Skelly was aware of any corporate identity assumed by its lessee. Essex makes no particular point of the matter, although existence of the corporation plainly predated and was used for business purposes by Essex as early as 1968.

For want of a superior alternative and a more explicit presentation by the parties, we conclude that the documentation should control and that recovery as to Count I should run to Arlo Essex, the individual. It also follows that the entry of judgment n.o.v. by the trial court in favor of defendant and against plaintiff Arlo Es-

sex, Inc. should be sustained. This finding is without prejudice to presentation and submission of Counts II and III on retrial where, depending on the evidence, either plaintiff may pursue those claims.

As to the submission of punitive damages, again only as to Count I, Skelly contends the submission was in error and entry of judgment in its favor n.o.v. was correct because Essex offered no substantial evidence of legal malice, the intentional doing of a wrongful act. The argument supporting this contention is the same dealt with earlier in this opinion, that territorial representatives Meadors and Leabo honestly believed Skelly would not exercise the 30 day cancellation clause unless the service station lessee were rendering unsatisfactory performance.

While it is true that Meadors and Leabo may be inferred to have entertained an honest belief Skelly would not, as a matter of policy, invoke the cancellation clause, there was no company policy to this effect. The evidence considered favorably to the plaintiffs established the inference from the proof of training sessions for area representatives that Skelly encouraged its agents to foster an impression that the cancellation clause should and would be ignored, while at the same time, Skelly retained the intent to use the clause, as it did in the case of Essex, to terminate a lease when it served Skelly's interests.

There was here no proof that Skelly entered into the lease with Essex intending any particular cancellation date or that Skelly intended to cause damage to Essex. Neither was essential as items of proof to be made by Essex. It was sufficient that Skelly caused its agents to represent falsely the unimportance of the cancellation clause when Skelly knew full well that the clause could and would be used to peremptorily oust a station lessee. The wrongful representation was made by Skelly through the innocent intermediaries, Meadors and Leabo, intentionally without just cause or excuse. These facts were sufficient for submission of the punitive damage claim as to Count I. *Beshears v. S–H–S Motor Sales*

*Corporation,* 433 S.W.2d 66, 73 (Mo.App. 1968).

## IV.

### ORDERS GRANTING DEFENDANT A NEW TRIAL FOR INSTRUCTION ERROR

Following its orders for entry of judgment n.o.v. for defendant on all counts, the trial court ordered a new trial for defendant on all counts in the alternative. The explanatory "Findings of Fact and Conclusions of Law" states the instruction error to have been:

(a) Packaging of instructions in Instructions 18–21 was in error and compounded damages and verdict form C should not have been given because Count III stated no cause of action apart from Count II.

(b) Instruction 6, which defined ordinary care, was improper.

(c) Instruction 9, the plaintiffs' verdict director for Count I, was in error for failing to identify the individual who made the representation and for the further reason that the instruction stated facts which were not actionable.

(d) Instruction 12, applicable to Count I, was in error in failing to define "occurrence" as were Instructions 16 and 20.

(e) The submission of a package of instructions as to Count IV was in error generally as were the contents of the individual instructions.

On this appeal, Essex takes no exception to the trial court's order granting defendant a new trial on Counts II and III. In its brief, Skelly urges that the award of a new trial generally be affirmed, as alternative relief to entry of judgment n.o.v., and argues particularly that the trial court was correct in its conclusions summarized in (a) through (e) above. Because the parties are in agreement with the new trial ordered as to Counts II and III and take no exception to the rulings of the trial court on those issues, we give no consideration to the merits of the rulings in (a), (b) and (d) above as they affect those counts. We do note, however, that on retrial of Counts II and III, instructions should be drawn in conformity with the views expressed in this opinion and not on the assumption this opinion affirms the rulings by the trial court on purported instruction errors affecting those counts. Also not considered are issues as to Count IV because of the conclusion plaintiffs stated no cause of action.

The first point of instruction error affecting Count I relates to Instruction 6, a general instruction defining ordinary care. As given, the instruction read:

"The phrase 'ordinary care' as used in these instructions means that degree of care that would be reasonable in plaintiffs' situation."

The trial court found this definition improper because it created "a special canon of care by which the acts of certain persons were to be treated."

█ The *Notes on Use* to MAI 23.05, the verdict directing instruction for fraudulent misrepresentations, state: "The phrase 'ordinary care' must be defined. See definition at MAI 11.09." Instruction 6 given in this case is an exact rescript of MAI 11.09. The giving of the instruction in the form used was required, Rule 70.02(b), and was certainly not error. Skelly seeks to change the law on the subject, but makes no satisfactory argument that the concept discussed in *Throckmorton v. M.F.A. Central Cooperative,* 462 S.W.2d 138 (Mo.App.1970) does not remain sound. Moreover, we are bound by the views expressed by the court in *Tietjens v. General Motors Corp., supra* which require the definition instruction in this form.

█ The next point, relating to Instruction 9, concerns the verdict directing instruction where the premise for recovery was the representation by defendant as to the length of time Essex could expect to remain as lease operator of the 23rd Street station. Skelly argues and the trial court found that the instruction was in error for failing to name the Skelly agent or agents who made the representation. Skelly cites *Wills v. Townes Cadillac-Oldsmobile, Inc.,* 490 S.W.2d 257 (Mo.1973) for the proposi-

tion that where the defendant denies agency of the alleged servant, the name of the alleged servant is to be substituted for the word "defendant" in MAI 18.01. Also argued is the failure to define scope and course of employment.

The propositions which Skelly recites are sound but they have no application in this case because the status of Meadors and Leabo as territorial representatives of Skelly was never disputed. The uncontested facts were that Meadors and Leabo acted generally for Skelly in securing lease operators for service stations, that they and they alone dealt with Essex on behalf of Skelly and at the time of their contracts with Essex, Meadors and Leabo were in the employment of Skelly. It was never contended by Skelly that Meadors and Leabo were without authority to deal with Essex on the subject of the station lease, only that representations as to the lease terms were either honestly made or made outside the scope of authority.

■ The case of *Price v. Ford Motor Credit Company,* 530 S.W.2d 249 (Mo.App. 1975) is instructive on the subject. There, plaintiff sued for actual and punitive damages for conversion of a vehicle by wrongful repossession. Defendant complained that the verdict directing instruction failed to require the jury to find the identity of defendant's agent and the scope of his authority. The court observed that agency was not controverted and that an instruction ignoring the issue was correct. Also, defendant there claimed the repossession was not actionable because the agent of Ford who acted did so in good faith. This contention was rejected on the same theory applicable here. A corporate defendant is bound by the knowledge of all its agents and cannot make the act of one agent proper by his ignorance of the true facts.

In a further point as to Instruction 9, the trial court's order repeated its earlier conclusion that representations as to a future course of conduct, even though proven false, are not actionable. On this basis, the court held the instruction erroneous because a recovery could not be granted even if all facts hypothesized in the instruction were proven to the jury's satisfaction by the evidence. At some length, the error of this conclusion has already been discussed earlier in this opinion and need not be repeated. Suffice it to say that plaintiffs' proof warranted submission of Count I to the jury and Instruction 9 correctly posed the facts under applicable law.

■ The final point of instruction error concerns Instruction 12 which conformed to MAI 4.01. Skelly's argument, accepted by the trial court, was that the term "occurrence" require explicit definition because multiple occurrences different as to each count of the petition were involved in the suit. The point would have some merit but for the composition of the instructions in this case "packaged" as to each of the counts. Considering the instructions as a whole, *Executive Jet Management & Pilot Services, Inc. v. Scott,* 629 S.W.2d 598 (Mo. App.1981), the jury was supplied a separate set of instructions for each claim which instruction format served to segregate each "occurrence" with the set of instructions, including the verdict director, applicable to it. In this situation, it seems inconceivable that a jury of normal intelligence could have entertained any confusion as to what occurrence was involved in Instruction 12.

■ To reverse a jury verdict on ground of instruction error, it must appear that the offending instruction misdirected, misled or confused the jury and the burden to prove the proposition rests with the party challenging the instruction. *Wilson v. Bob Wood & Associates, Inc.,* 633 S.W.2d 738, 751 (Mo.App.1981). Skelly has not shown this to be the case with Instruction 12 for the reason that the instructions as a whole and the verdicts returned indicate a discrete identification of each occurrence without confusion or misdirection on account of multiple occurrences.

The brief of respondent, more than 90 pages in length, the motions of more than 100 pages presented by respondent to the trial court, the briefs and suggestions of appellant, and the trial transcript of some

1450 pages have presented this court with a formidable task. The major issues raised by both parties have been fully discussed. Other issues of collateral import, particularly in the fifteen points of respondent's brief, have been considered and, to the extent they are inconsistent with the result announced, they are denied.

The judgment n.o.v. for defendant and against Arlo Essex as to Count I is reversed, the order granting defendant a new trial is reversed and the cause is remanded with direction to enter judgment in favor of Arlo Essex and against defendant on the verdict of the jury returned as to Count I. Judgment n.o.v. for defendant against Arlo Essex, Inc. as to Count I is affirmed.

The judgment n.o.v. for defendant and against plaintiffs as to Counts II and III is reversed. The order granting defendant a new trial as to Counts II and III is affirmed and the cause is remanded for trial on those counts.

The judgment n.o.v. for defendant and against plaintiffs as to Count IV is affirmed.

Costs are apportioned equally between the parties.

All concur.

## ON MOTION FOR REHEARING

PER CURIAM.

Respondents, on Motion for Rehearing or for Transfer to the Missouri Supreme Court, have essentially reasserted the same contentions originally made in their argument and brief in support of the judgment entered by the trial court and have not, with a single exception, called attention to any matter of fact or law overlooked. The exception relates to the amount of judgment recoverable by appellants on the first count of the petition.

■ The verdict returned by the jury as to Count I awarded appellants actual damages of $3,000.00. In fact, by the concession of appellants at trial and by the damage instructions given to the jury, appellants were limited in their recovery of actual damages on Count I to $100.00. Respondents correctly assert that if judgment n.o.v. in their favor is reversed and judgment on the verdict is to be entered, the award should be remitted to $100.00.

The opinion previously delivered is modified in that the trial court is directed to enter judgment on the jury verdict as to Count I remitting the amount of actual damages to $100.00. In all other respects, the motion of respondents for rehearing is overruled and the motion for transfer is denied.